[No. D059607. Fourth Dist., Div. One. Apr. 9, 2013.]

THE PEOPLE, Plaintiff and Respondent, v.
WAYNE TRUVOLL EVANS, Defendant and Appellant.

**[CERTIFIED FOR PARTIAL PUBLICATION¹]**

---

¹ Pursuant to California Rules of Court, rule 8.1110, this opinion is certified for publication with the exception of parts I, II, III and IV.

## COUNSEL

Valerie G. Wass, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Steve Oetting and Lise S. Jacobson, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

McCONNELL, P. J.—

## INTRODUCTION

A jury convicted Wayne Truvoll Evans of one count of unlawfully taking a vehicle (Veh. Code, § 10851, subd. (a); count 1), three counts of receiving stolen property (Pen. Code,[2] § 496d; counts 2, 4 & 6), one count of grand theft of personal property (§ 487, subd. (a); count 7), one count of vandalism over $400 (§ 594, subds. (a) & (b)(1); count 8), and one count of conspiracy (§ 182, subd. (a)(1); count 9). The jury also found true allegations the victims' aggregate losses exceeded $65,000 (§ 12022.6, subd. (a)(1)) and $200,000 (§ 12022.6, subd. (a)(2)). The trial court granted Evans's motion for acquittal under section 1118.1 as to two other counts of unlawfully taking a vehicle (counts 3 and 5) and an allegation the value of the stolen property exceeded $100,000 (§ 1203.045, subd. (a)). In addition, the trial court dismissed the receiving stolen property convictions under section 1385. The trial court sentenced Evans to an aggregate term of six years in prison.

Evans appeals, contending we must reverse his convictions because the trial court denied his motion for a mistrial after the jury initially received a transcript of an audiotaped police interview of Evans, which mistakenly included a detective's comment that Evans had previously been to prison. Evans additionally contends we must reverse his convictions because they were based on a legally impossible conspiracy theory and may have been based on the commission of overt acts occurring after completion of the target crime. He alternatively contends we must reverse his convictions for counts 1 and 7 because these offenses were not natural and probable consequences of the conspiracy. He also contends we must reverse his convictions because there was insufficient evidence to support his participation in the conspiracy. Finally, he contends we must reverse the true finding on the section 12022.6, subdivision (a)(2), enhancement because there is insufficient evidence the victims' properly calculated aggregate losses exceeded $200,000. We conclude each of Evans's contentions is meritless and affirm the judgment.

## BACKGROUND

In April 2010[3] several companies stored trucks, excavators and other heavy equipment at a trucking company's facility in Vista, California. Barton Dixon

---

[2] Further statutory references are also to the Penal Code unless otherwise stated.

[3] All other background events occurred in 2010 unless otherwise stated.

stored his excavator and its attached hydraulic breaker there. Joseph Mattos stored his red truck and trailer there. All four items were at the facility the afternoon of April 11. The next morning, all four items were gone and a gate not normally used by the trucking company was lying in the driveway.

The gate had red paint on it at a height corresponding to the trailer. There were tracks in the dirt leading from where the excavator had been stored to a few feet from where the truck and trailer had been stored. A person could operate the excavator with a universal key, but could not move it any great distance without a trailer because of its low maximum speed.

Around noon five days earlier, on April 7, Jeffrey Roberts, who lived in Los Angeles, approached Deborah Ennis, one of the trucking company's employees, inquiring about a job with Mattos's company. Mattos's company's name appeared prominently on Mattos's trailer, which was parked near the trucking company's front gate. Ennis spoke with Roberts for about five minutes. During the conversation, Ennis saw a car parked at the bottom of the stairs leading to her office. There was an African-American or Hispanic man seated in the car. The car resembled the one Evans had rented approximately a week earlier.

Cell phone records showed calls were made from Roberts's cell phone between 11:30 a.m. and 3:07 p.m. that day using cell towers near the trucking company. Between 12:13 p.m. and 2:52 p.m. calls were made from Roberts's cell phone using cell towers located near Evans's home in Encinitas. Six calls were made between Roberts and Evans's cell phones that morning, the last of which was at 10:57 a.m. One call was made from Evans's cell phone to Roberts's cell phone at 5:30 p.m. that afternoon.

Between 9:36 p.m. on April 11, the day the truck, trailer, and excavator were last seen, and 2:30 a.m. on April 12, the day the truck, trailer, and excavator were discovered missing, at least 61 calls were exchanged between ·Roberts's cell phone and Evans's cell phone. At 7:39 p.m., Roberts's cell phone used a cell tower in the Anaheim area. Around 9:14 p.m., Roberts's cell phone used cell towers located near Evans's home. Between 9:46 p.m. and 11:50 p.m. and between 12:02 a.m. and 12:21 a.m. the following morning, Roberts's cell phone used cell towers located near the trucking company. Between midnight and 1:59 a.m., Roberts's cell phone used towers along northbound Interstate 15, including a cell tower near the Pala Indian Reservation between 1:24 a.m. and 1:59 a.m.

There are two routes truckers can take to avoid the weigh stations on Interstates 5 and 15, where drivers may be requested to show permits, driver's licenses and medical cards. Of the two routes, the shortest and easiest to travel is through Pala.

Sometime in April, Roberts asked Chakula Baskom[4] for permission to store the excavator in Baskom's backyard in Los Angeles for a week or two. Baskom agreed. Baskom later saw Roberts and a man named "Cricket" pull the excavator off the truck and trailer, which were parked in the alley by Baskom's house. Roberts then drove the excavator into Baskom's backyard.

Sometime in April or May, Evans called Arthur Turner,[5] a truckdriver, and offered Turner $1,000 to come to Los Angeles and drive a truck for him. Turner declined the offer.

Four days after the thefts, on April 16, a male left a voicemail message for Mattos's company asking about employment. Four days after that, on April 20, Mattos received the first in a series of 39 to 40 phone calls and voicemail messages from Evans. During the first call, Evans told Mattos he had seen Mattos's truck in northern Los Angeles and asked the driver about employment. Evans said he knew the truck belonged to Mattos because Mattos's company's name was on the door of the truck. Mattos told Evans the truck had been stolen along with a trailer and an excavator.

On April 23 Evans called Mattos and told Mattos he knew the location of the excavator and would provide the location for $6,500. Mattos said he would pass the information to the owner of the excavator. Ten minutes later, Evans called Mattos and asked for the excavator's serial number. Mattos did not know the serial number, but provided Evans with the model number.

On April 27 Evans called Mattos and asked if Mattos had heard from the excavator's owner, as the owner had not called Evans. About 10 minutes later, Evans called Mattos again. He asked for the license plate numbers of the truck and trailer. He also asked whether there was a reward for the return of them. Mattos told Evans there was a $1,000 reward for each. Evans said he

---

[4] Baskom had two prior convictions for burglary and a prior conviction for possession of a controlled substance. He testified under a grant of immunity.

[5] Turner had prior convictions for second degree burglary, grand theft, false imprisonment, extortion, and domestic violence. He testified under a grant of immunity.

wanted more reward money. He explained he understood Mattos's pain because someone had stolen his excavator 10 years earlier. He assured Mattos that if he saw Mattos's truck and trailer, he would take them and give them back to Mattos.

On May 18 Evans called Mattos and told Mattos he would provide the location of the truck and trailer if Mattos gave him $3,000. On May 20 Mattos told Evans he would not have the money until the insurance company paid him and he needed proof Evans knew the location of the truck before he gave Evans the money. He asked for a picture of the truck or to meet at the truck's location.

The next day, Evans called Mattos and told him he could not get a picture because his cell phone did not have a camera and he could not get close enough, as there were two pit bulls in the yard with the truck and trailer. Mattos told Evans he would not meet him or give him any money without a picture.

At some point, Mattos spoke with officers from the Regional Auto Theft Task Force (task force) and agreed to let an officer act on his behalf with Evans. Mattos and Evans subsequently set up a meeting for May 26. Evans told Mattos that, once Mattos gave him $3,000, he would leave in his car, make a phone call, then call Mattos back or have Mattos follow him to the location of the truck and trailer.

At 6:13 p.m. on May 26, California Highway Patrol Officers John Jiacoma and John Clements, who were working undercover for the task force, met with Evans at a restaurant in Orange County. Jiacoma met with Evans first. Jiacoma pretended to be Mattos's brother and claimed Mattos sent him to meet with Evans. He said Mattos had told him Evans had Mattos's truck and trailer and he was supposed to pay Evans. Evans said he did not know the location of the truck and trailer. Jiacoma said he would not give Evans the money until Evans took him to their location. Evans again said he did not know their location. Rather, he knew who did and this person would provide the location once Evans had the money. Evans claimed he had seen the truck in the San Fernando Valley and eventually contacted Mattos, who told him the truck was stolen.

At this point, Clements joined the meeting. Jiacoma introduced Clements as his son. Clements asked if they were getting the truck and trailer back. Jiacoma responded that Evans did not know their location. Evans said he had seen the truck in the San Fernando Valley and his friend told him there were

a couple of pit bulls at the location where the truck and trailer were stored. Clements showed Evans a wad of cash and Jiacoma said, "If I give you the roll . . . , I'd never see you again. And that's the thing." Evans said he understood.

During the meeting, Evans received a phone call. Evans told the caller, "I'm in the middle of a conversation . . . . I'll call you back in 20 minutes man." When the officers commented that $3,000 was a lot of money for them, Evans replied that he had lost an excavator about five years earlier. Evans claimed the man he knew would meet with him if Evans had the cash. Clements responded, "The cash stays in my pocket. Alright cut our losses."

After the meeting, police officers took Evans into custody, provided him the advisements required by *Miranda v. Arizona* (1966) 384 U.S 436 [16 L.Ed.2d 694, 86 S.Ct. 1602] (*Miranda* advisements), and interviewed him. In the interview, Evans stated he understood his rights and insisted the officers did not have a case against him.

Evans repeated his claims about seeing Mattos's truck in the Los Angeles area, eventually contacting Mattos inquiring about job openings, and learning from Mattos the truck had been stolen. Mattos gave him the truck's license plate number and he told Mattos he would call Mattos if he saw the truck. Mattos offered him a reward of $1,500 each for the return of the truck and the trailer. Mattos also gave him the excavator's serial number and said the reward for its return was $1,000.

Evans told Mattos he had seen an excavator in someone's backyard, but it did not have a breaker attached to it and was not the stolen one. Evans asked Mattos if Mattos thought the theft was an inside job and Mattos "like brushed it off." Evans claimed he previously had an excavator stolen from a yard and a rig stolen off the freeway. He said he assured Mattos that if he knew where Mattos's truck and trailer were, he would get them for him.

Mattos asked for a picture of the truck and trailer. Evans relayed the request to a man he knew. The man told Evans there were two pit bulls in the yard with the truck and trailer. Evans said the man was going to pay Evans $500 out of the $3,000 reward for the truck and trailer. Evans hoped Mattos would give him additional reward money.

During the interview, Evans received a call on his cell phone from Roberts's cell phone. Evans's cell phone contained Roberts's photograph. After the interview, the detective informed Evans he was under arrest. Evans responded that Mattos "would never see his equipment again" and Evans "was going to f—k his s—t up."

On July 1, task force member, El Cajon Police Detective Michael Doyle, rearrested Evans, gave him *Miranda* advisements, and interviewed him. During the interview, Evans admitted he had a commercial driver's license and used to move heavy equipment. He also admitted he was in Pala late in the evening on April 11 and early the following morning. When Doyle asked, "Who's Jeffrey Roberts?," Evans responded, "I don't know and I don't give a f—k." Evans later acknowledged knowing Roberts. He also acknowledged asking for $6,500 for the return of the excavator. Evans claimed Mattos told him they would split the reward money. Evans said it would be ludicrous to sell Mattos's truck for $3,000 because the tires were worth $3,000, the motor was worth $10,000, and the hood was worth $4,000.

Evans denied being at the trucking company at the time of the thefts or having anything to do with the truck's theft. When Doyle suggested Roberts was involved, Evans said the theft was not Roberts's "m.o." When Doyle accused Evans and Roberts of talking on the phone at least 60 times on April 11 in the area of the trucking company, Evans said he did not believe they had talked that many times and, if they had, Evans must have just been hanging up quickly. Evans also claimed he did not remember talking with Roberts that night.

Doyle asked Evans what Evans and Roberts were doing together on April 11. Evans said, if they were together, they would have been selling drugs. Doyle pointed out that if Evans drove from his home in Encinitas to his girlfriend's home in Vista along Sycamore Drive, Evans would pass right by the trucking company and, therefore, would know of it and its location. Evans claimed he drove a different route to his girlfriend's home. Evans told Doyle that, if Doyle reduced his bail, he would post a bond and take Doyle directly to the truck and trailer. He said they were at a residence in the Los Angeles area with two pit bulls.

On September 2 Doyle called Baskom and asked about the excavator. Baskom said the excavator was still in his backyard. Doyle met with Baskom at Baskom's home on September 7. Dixon's excavator and breaker were in Baskom's backyard. Baskom drew Doyle a map showing the approximate location of the truck and trailer. With the assistance of a helicopter, Doyle located them. Roberts lived about 15 to 20 minutes by car from their location.

Mattos received the truck and trailer back on September 7. The truck was in good condition, except the batteries and ignition switch were missing and the driver's side door window was broken. A radio and safety gear were also missing from inside the truck.

The trucking company paid $2,000 to replace its broken gate. An expert testified the fair market value of the truck was $60,000 and Mattos testified it would sell for between $65,000 and $70,000 at an auction. Another expert testified the fair market value of the trailer was between $72,000 and $75,000. Mattos estimated he lost $37,600 in business while his truck and trailer were missing. One of his main clients paid $38,618.83 to another business that he would have paid to Mattos during this timeframe.

A third expert testified the fair market value of Dixon's excavator without the attached breaker was $50,000, and it would sell for $40,000 at an auction. The expert did not have an opinion on the value of the breaker. Dixon repurchased the excavator and breaker from his insurance company for $46,000 plus $1,710 in impound and towing fees. Before offering to repurchase the items, Dixon searched six auction Web sites. The most expensive excavators he found, which likely did not have attached breakers, were $43,000. He based the amount of his $46,000 offer on the inclusion of the attached breaker.

## DISCUSSION

### I–IV[*]

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

### V

#### *Aggregate Losses*

Evans contends we must reverse the finding under section 12022.6, subdivisions (a)(2) and (b), that the victims' aggregate losses exceeded $200,000 because there is insufficient evidence to support the finding. More particularly, he contends the calculation of the victims' losses improperly included one victim's lost income or profits. Instead, he contends the calculation should include only the victims' property losses. We agree the calculation should not include lost income or profits, but conclude there is sufficient evidence to support the jury's finding nonetheless.

---

[*]See footnote, *ante*, at p. 242.

Section 12022.6 provides in relevant part: "(a) When any person takes, damages, or destroys any property in the commission or attempted commission of a felony, with the intent to cause that taking, damage, or destruction, the court shall impose an additional term as follows: [¶] . . . [¶] (2) If the loss exceeds two hundred thousand dollars ($200,000), the court, in addition and consecutive to the punishment prescribed for the felony or attempted felony of which the defendant has been convicted, shall impose an additional term of two years. [¶] . . . [¶] (b) In any accusatory pleading involving multiple charges of taking, damage, or destruction, the additional terms provided in this section may be imposed if the aggregate losses to the victims from all felonies exceed the amounts specified in this section and arise from a common scheme or plan."[7]

■ Resolving Evans's contentions requires us to first construe whether "loss" as used in the statute is limited to property loss or includes other economic losses, such as lost income or profits. "The fundamental task of statutory construction is to ascertain legislative intent so as to effectuate the purpose of the law. [Citation.] When construing statutes, we look first to the words of the statute, which should be given their usual, ordinary, and commonsense meaning. [Citation.] Where the language of a statute is clear and unambiguous, we go no further. [Citation.] Only if the statutory language is ambiguous do we consult ' "extrinsic aids," ' such as the objects to be achieved by the statute, its legislative history, public policy, contemporaneous administrative construction, and the statutory scheme of which it is a part. [Citations.] In such a situation, we must select the construction that comports most closely with legislative intent, with a view towards promoting rather than defeating the statute's general purposes. [Citation.]" (*People v. Mejia* (2012) 211 Cal.App.4th 586, 611–612 [149 Cal.Rptr.3d 815].)

The statute does not define "loss," except in the inapposite context of the manufacture and possession for sale of counterfeit computer software or unassembled computer software components. (§ 12022.6, subd. (e).)[8] The

---

[7] Section 12022.6 was enacted in 1976, amended several times, and repealed and reenacted without substantive change effective January 1, 2012. (Stats. 1976, ch. 1139, § 305.5, p. 5162, eff. July 1, 1977 [enactment]; Stats. 2010, ch. 711, § 4, eff. Jan. 1, 2012 [repeal]; Stats. 2010, ch. 711, § 5, eff. Jan. 1, 2012 [reenactment].) Our discussion refers to the current version of the statute as it is identical to the version in effect when Evans committed his crimes.

[8] Section 12022.6, subdivision (e), provides: "For the purposes of this section, the term 'loss' has the following meanings: [¶] (1) When counterfeit items of computer software are manufactured or possessed for sale, the 'loss' from the counterfeiting of those items shall be equivalent to the retail price or fair market value of the true items that are counterfeited. [¶] (2) When counterfeited but unassembled components of computer software packages are recovered, including, but not limited to, counterfeited computer diskettes, instruction manuals, or licensing envelopes, the 'loss' from the counterfeiting of those components of computer

reference to "loss" in section 12022.6, subdivision (a)(2), is reasonably interpreted as directly relating to the value of the property taken, damaged, or destroyed. However, the reference to the "losses to the victims" in section 12022.6, subdivision (b), arguably suggests a potentially broader application.

None of the cases cited by the parties assists us in interpreting the statute. In reviewing the legislative history of the statute, we note it was first enacted as part of the determinate sentencing law. (Added by Stats. 1976, ch. 1139, § 273, p. 5140 and amended by Stats. 1977, ch. 165, § 15, p. 647.) The major provisions of the law are codified at section 1170 et seq. (*People v. McCart* (1982) 32 Cal.3d 338, 340, fn. 1 [185 Cal.Rptr. 284, 649 P.2d 926].) In enacting the law, the Legislature stated, "the purpose of imprisonment for crime is punishment. This purpose is best served by terms proportionate to the seriousness of the offense with provision for uniformity in the sentences of offenders committing the same offense under similar circumstances." (§ 1170, subd. (a)(1); see *People v. Hinojosa* (1980) 103 Cal.App.3d 57, 64–65 [162 Cal.Rptr. 793] ["one of the expressed purposes of the determinate sentencing law is to achieve uniformity in sentencing . . ."].)

In summarizing the application of new section 12022.6 in its then form, a state Assembly committee stated, "If the victim suffers a *property loss* of between $100,000 and $500,000, then 50% of the [base] term may be added to the sentence. If the loss is over $500,000, then the enhancement may be 100% of the base term." (Assem. Com. on Criminal Justice, Analysis of Sen. Bill No. 42 (1975–1976 Reg. Sess.) as amended Apr. 22, 1976, p. 4, italics added.) Legislative history documents pertaining to 1977 amendments lowering the statute's monetary thresholds to $25,000 and $100,000 also discussed the application of the statute in terms of property loss or value. (See, e.g., Sen. Com. on Judiciary, Analysis of Assem. Bill No. 476 (1977–1978 Reg. Sess.) as amended June 6, 1977, p. 11; Assem. Conc. Sen. Amends. to Assem. Bill No. 476 (1977–1978 Reg. Sess.) as amended June 14, 1977, p. 2; Assem. Com. on Criminal Justice, Report on New Statutes Affecting Criminal Law (1977–1978 Reg. Sess.) p. 15; Legis. Counsel, Rep. on Assem. Bill No. 476 (1977–1978 Reg. Sess.) p. 3; Cal. Dept. of Corrections, Enrolled Bill Rep. on Assem. Bill No. 476 (1977–1978 Reg. Sess.) June 30, 1977, p. 5.) Legislative history documents pertaining to subsequent amendments to the statute, including the last substantive amendments made in 2007, continued to discuss the application of the statute in terms of property loss or property value. (See, e.g., Assem. Off. of Research, 3d reading analysis of Assem. Bill No. 931 (1991–1992 Reg. Sess.) as amended July 1, 1992, p. 2; Legis. Analyst,

---

software packages shall be equivalent to the retail price or fair market value of the number of completed computer software packages that could have been made from those components."

analysis of Assem. Bill No. 939 (1991–1992 Reg. Sess.) as amended Apr. 29, 1991, p. 414; Off. of Sen. Floor Analyses, Analysis of Sen. Bill No. 862 (1993–1994 Reg. Sess.) as amended Aug. 16, 1993, p. 3; Off. of Sen. Floor Analyses, 3d reading analysis of Assem. Bill No. 293 (1997–1998 Reg. Sess.) as amended June 30, 1997, p. 1; Assem. Conc. Sen. Amends. to Assem. Bill No. 1705 (2007–2008 Reg. Sess.) as amended July 9, 2007, p. 3; Off. of Sen. Floor Analyses, 3d reading analysis of Assem. Bill No. 1705 (2007–2008 Reg. Sess.) as amended July 9, 2007, pp. 1, 4.)

■    We are compelled to conclude from these documents, the Legislature intended "loss" in section 12022.6, subdivisions (a)(2) and (b), to mean the value of the property taken, damaged, or destroyed, and not to include other types of economic losses suffered by the victim. Such an interpretation is compatible with the determinate sentencing law's overarching goal of achieving uniformity in sentencing as it allows sentencing decisions to be based on comparable criteria. Were the application of the statute to depend on the unique economic effect of a crime on a particular victim, criminals who commit similar crimes under similar circumstances could receive substantially different sentences. Accordingly, we conclude Mattos's lost income and profits may not be considered in determining whether the statute applies in this case.[9]

Even without the inclusion of Mattos's lost income and profits, however, there is sufficient evidence in the record, viewed in the light most favorable to the judgment, to establish the victims' aggregate property losses exceeded $200,000. Using the most favorable figures presented to the jury, the damage to the trucking company's fence was $2,000, the stolen truck was worth $70,000, the stolen trailer was worth $75,000, and the stolen excavator without the attached breaker was worth $50,000. These figures total $197,000.

Although the People's expert did not have an opinion on the value of the breaker attachment, the evidence showed the auction value of the excavator was between $40,000 and $43,000 without the breaker. Dixon offered his insurance company $46,000 for both items to account for the value of the breaker above the value of the excavator. The jury could have reasonably inferred from this evidence the breaker was worth between at least $3,000 and $6,000. Adding the more favorable figure to the existing total brings the victims' aggregate property losses to $203,000, which surpasses the $200,000 threshold required for the statute's application. Therefore, Evans has not established the finding under section 12022.6, subdivisions (a)(2) and (b), must be reversed.

---

[9] Our conclusion does not affect whether and in what amount Evans may owe Mattos under victim restitution statutes.

## DISPOSITION

The judgment is affirmed.

Huffman, J., and McDonald, J., concurred.

A petition for a rehearing was denied April 26, 2013, and appellant's petition for review by the Supreme Court was denied July 24, 2013, S210753. Werdegar, J., did not participate therein. Kennard, J., was of the opinion that the petition should be granted.