Filed 8/8/13

<u>**CERTIFIED FOR PUBLICATION**</u>

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>　　Plaintiff and Respondent,<br><br>　　　　v.<br><br>DANNY VICTOR WILLIAMS,<br><br>　　Defendant and Appellant. | F062575<br><br>(Super. Ct. No. VCF222476A)<br><br>**OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Tulare County.  Brett R. Alldredge, Judge.

Nuttall Coleman & Wilson; Law Office of Roger D. Wilson and Roger D. Wilson for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Julie A. Hokans and John A. Bachman, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

Section 386 of the Penal Code proscribes the unlawful construction or maintenance of a fire protection system in a manner which threatens the safety of any occupant or user of a structure in the event of a fire.  Since no reported case has ever

1.

addressed this crime, we must interpret the statute as a matter of first impression. Our opinion holds that Penal Code section 386 requires proof of the defendant's specific intent to either (1) install a fire protection system which is known to be inoperable or (2) impair the effective operation of a fire protection system. We further hold the word "impair," as used in the statute, means to make worse or diminish in some material respect.

Appellant, Danny Williams, was convicted by a jury on twenty-six counts of violating section 386 and one count of conspiracy to violate section 386. He was also found guilty of grand theft (Pen. Code § 487, subd. (a)),[1] diversion of construction funds (§ 484b), and twenty-six misdemeanor charges for violating an assortment of regulations of the State Fire Marshal. The jury returned a true finding of an enhancement allegation pursuant to section 12022.6, subdivision (a)(1), for victims' losses in excess of $65,000.

Williams asserts multiple grounds for reversal of the jury's verdict, ranging from insufficient evidence and instructional error to prosecutorial misconduct, juror misconduct, and ineffective assistance of counsel. We agree the convictions under section 386, as well as the single count of conspiracy and true finding on the enhancement allegation under section 12022.6, must be reversed and dismissed for lack of sufficient evidence. The judgment is affirmed as to all other counts.

**FACTUAL AND PROCEDURAL BACKGROUND**

Danny Williams worked as a contractor in the fire protection industry. He held a class C-16 specialty license issued by the Contractors State License Board which authorized him to install and service all types of fire protection systems. As the Responsible Managing Officer under his license, Williams operated American Fire Services, Inc., dba American Fire Protection ("American Fire Protection").

---

[1] All further statutory references are to the Penal Code unless otherwise noted.

2.

American Fire Protection specialized in the inspection and maintenance of portable fire extinguishers, sprinkler systems, and other types of automatic fire suppression systems. Headquartered in Camarillo, California, the company's staff of approximately six to eight employees provided services to customers throughout the state. One of those employees, Ken Speck, lived in Exeter and was responsible for the company's sales and services in Tulare County. It was through Ken Speck that Danny Williams came into contact with the main victim in this case, Svenhard's Swedish Bakery ("Svenhard's").

Svenhard's is a high volume bakery that sells pastries to grocery stores and other retailers. In approximately 2007, the company took steps to relocate its manufacturing operations from Oakland to Tulare County. It acquired a vacant factory in Exeter, estimated to be "five acres under roof," which it planned to convert into a commercial bakery and production plant.

The Exeter facility was equipped with an automatic fire sprinkler system consisting of approximately 4,000 to 5,000 sprinkler heads throughout six zones of the building. The zones were designated by system "risers," referring to the main pipes that rise out of the floor and supply water to sprinkler heads located within a certain area. The system, however, was decades old and had not been inspected or serviced in many years.

Svenhard's hired a fire protection contractor called Jorgensen and Company ("Jorgensen") to perform a comprehensive inspection and assessment of its sprinkler system. Numerous deficiencies were found in all six zones/risers, such that the overall system failed inspection, i.e., fell below the standards established by the National Fire Prevention Association (NFPA) and the California Code of Regulations (Cal. Code Regs., tit. 19, §§ 901-906). An informal evaluation by the Tulare County Fire Department confirmed the system was in need of extensive repairs.

Jorgensen eventually prepared a written proposal to repair the sprinkler system. Jorgensen's bid of May 8, 2008 was broken down in terms of work and price for each

3.

zone, Riser 1 through Riser 6, for a total cost of $147,897. The proposal was not accepted. According to its representatives, Svenhard's had a "shoestring budget" for the project and wanted to find a more cost effective bid.

Coincidentally, the company soon received a visit from Ken Speck of American Fire Protection, who made a "cold call" to the Exeter facility hoping to sell fire extinguisher services. Speck spoke with a manager who explained the company's needs with regard to the sprinkler system. Mr. Speck advised that his boss, Danny Williams, could perform the necessary maintenance. Arrangements were made for Williams to visit the facility.

Following a series of meetings and negotiations with Williams, Svenhard's entered into a contract with American Fire Protection for specified repairs to Risers 1 through 6 of the sprinkler system. The total contract price was $98,000. American Fire Protection was to receive a $30,000 deposit and progress payments of $24,000, $24,000 and $20,000 as the work was completed.

Svenhard's purchased new fire extinguishers from Williams at an additional cost of $6,079.32. The parties further agreed that American Fire Protection would complete a project involving "outside stem and yoke" or "OS&Y" valves buried outside of the building. Williams offered to replace the OS&Y valves and raise them above ground for an extra $4,000.

Work commenced on the Svenhard's project in late July or early August 2008. Williams and his employees, varying at times between two to five people, spent approximately two to three weeks repairing Risers 1 through 5 of the sprinkler system. Williams subcontracted with a man named James Martinez to replace the OS&Y valves, which was a two-day assignment.

Williams later informed Svenhard's that work was complete on the OS&Y valves and Risers 1 through 5. Svenhard's accordingly disbursed payments totaling $78,000 pursuant to the sprinkler system contract, plus $6,079.32 for the new fire extinguishers

4.

and $4,000 for the OS&Y valve replacement. Work on Riser 6 was put on hold because it required the installation of new sprinkler heads to cover a cold storage area that had not yet been constructed. The project could not proceed until engineering plans were completed and the necessary building permits were obtained. Svenhard's also requested that work cease pending verification of American Fire Protection's workers' compensation insurance coverage.

In September 2008, Svenhard's project manager, Gene Dorough, happened to mention the company's dealings with American Fire Protection during a conversation with the local fire inspector, Jerry Sterling. Mr. Sterling had performed the informal evaluation of Svenhard's sprinkler system on behalf of the Tulare County Fire Department approximately four months earlier. After speaking with Mr. Dorough, Jerry Sterling visited the facility again to evaluate the work completed up to that point. Mr. Sterling found numerous deficiencies and fire code violations were still present throughout the entire system.

Tulare County officials instructed Svenhard's to stop work on its sprinkler system and have the facility re-assessed by Jorgensen. Svenhard's eventually hired Jorgensen to complete the repair work left unfinished by Williams and his crew. Meanwhile, the Tulare County District Attorney's Office began investigating American Fire Protection.

Authorities conducted an undercover interview with Williams in November 2008. Search warrants were executed at multiple locations, including American Fire Protection's business address and at Williams' personal residence. After reviewing volumes of seized records, Tulare County fire officials assembled a task force to examine the premises of other American Fire Protection customers.

The task force surveyed restaurants and small businesses that had hired American Fire Protection to inspect their "hood" systems, i.e., automatic fire extinguishing systems designed to cover kitchen areas and cooking equipment. In most instances, the customers' systems were not fully compliant with the fire code and/or needed to be

5.

upgraded to meet minimum regulatory standards. Every hood system reviewed by the task force had been inspected and serviced by Ken Speck.

In April 2009, Tulare County officials inspected the OS&Y valves which had been replaced at Svenhard's approximately seven months earlier. A supervisor from the county building department mistakenly concluded that Williams installed the wrong type of valve. This resulted in Svenhard's paying approximately $17,000 to a local construction company for the purchase and installation of what turned out to be an identical piece of equipment. Excavation of the area around the valves revealed a leak from a pipe in the underground plumbing, which Svenhard's also paid to have fixed.

A Tulare County grand jury indicted Danny Williams and Ken Speck on multiple felony and misdemeanor charges relating to the business practices of American Fire Protection. Ken Speck accepted a plea deal in exchange for his cooperation and testimony in the prosecution's case against Williams. An amended indictment was filed on July 27, 2010, charging Williams with thirty-four counts of "the crime of inoperable or impaired fire protection system in violation of Penal Code 386(a)" in connection with his own work at Svenhard's and the work performed by Ken Speck at thirty-three separate business establishments.

In relation to the Svenhard's project, Williams was also charged with unlawful diversion of construction funds (§ 484b), grand theft (§ 487, subd. (a)), and misdemeanor violations of State Fire Marshal's Regulations for automatic fire extinguishing systems (Health & Saf. Code, § 13195) and portable fire extinguishers (Health & Saf. Code, § 13160). Additional charges pertaining to the restaurants and small businesses included one count of conspiracy to violate section 386 (§ 182, subd. (a)(1)), twenty-eight misdemeanor counts of petty theft (§ 484, subd. (a)), and forty-five misdemeanor counts of violating State Fire Marshal's Regulations for automatic fire extinguishing systems and portable fire extinguishers. Finally, an enhancement allegation was made pursuant to section 12022.6, subdivision (a)(1), for victim losses in excess of $65,000.

A five-week jury trial began on January 20, 2011. At the conclusion of its case-in-chief, the prosecution dismissed three of the section 386 charges (Counts 63, 96 & 105), four counts of petty theft (Counts 56, 64, 84 & 106) and four counts of regulatory violations (Counts 15, 65, 107 & 108). The trial court subsequently granted a defense motion pursuant to section 1118.1 to dismiss all remaining counts of petty theft for lack of sufficient evidence (Counts 7, 13, 17, 21, 26, 30, 34, 37, 41, 44, 49, 53, 60, 67, 71, 75, 78, 81, 87, 90, 93, 98, 102 & 110).

The jury returned its verdict on February 23, 2011. Williams was acquitted on five counts of violating section 386 (Counts 36, 40, 46, 52 & 109), one count of violating regulations for automatic fire extinguishing systems (Count 38) and all counts pertaining to regulations for portable fire extinguishers (Counts 5, 9, 19, 23, 28, 32, 39, 42, 51, 58, 62, 69, 73, 95, 100 & 104). He was found guilty of all remaining charges. A true finding was returned on the special enhancement allegation under section 12022.6, subdivision (a)(1).

Williams was sentenced on May 20, 2011. The trial court imposed a total prison term of five years, calculated by a mitigated base term of two years for the section 386 violation involving Svenhard's (Count 1); a one-year sentence consecutive to Count 1 for violating section 386 as alleged in Count 6; a one-year sentence consecutive to Count 6 for violating section 386 as alleged in Count 10; and a one-year sentence consecutive to Count 10 for conspiracy to violate section 386 as alleged in Count 112. The middle term of two years was imposed for each conviction of unlawful diversion of construction funds (Count 2) and grand theft (Count 3), to be served concurrent to Count 1. Concurrent two-year sentences were imposed for each of the remaining section 386 convictions (Counts 12, 16, 20, 24, 25, 29, 33, 43, 47, 48, 55, 59, 66, 70, 74, 77, 80, 83, 86, 89, 92, 97 & 101.) No time was imposed for the misdemeanor convictions.

A timely notice of appeal was filed on the day of sentencing.

## DISCUSSION

**Penal Code § 386**

### A.    Elements and Required Mental State

Section 386 provides in relevant part: "Any person who willfully or maliciously constructs or maintains a fire-protection system in any structure with the intent to install a fire protection system which is known to be inoperable or to impair the effective operation of a system, so as to threaten the safety of any occupant or user of the structure in the event of a fire, shall be subject to imprisonment…."  (§ 386, subd. (a).)  The statute defines a "fire protection system" as including any automatic fire sprinkler system or automatic fixed fire extinguishing system.  (§ 386, subd. (c).)  Other subdivisions describe these systems in detail. (§ 386, subds. (d)(1), (d)(3).)

The meaning and application of the statute was a point of contention between the parties at trial.  Williams argued section 386 requires the specific intent to either install a system known to be inoperable, or to impair the effective operation of an existing system.  The prosecution argued the offense is a general intent crime, provable by the defendant's knowledge that a fire protection system is "impaired" at the conclusion of any maintenance he or she performed on the system.  The prosecution defined "impaired" as meaning in "less than perfect" condition, and relayed this to the jury during closing argument.

We address these competing formulations of the offense to help frame the issues in this case and provide guidance to trial courts in the future.  The proper interpretation of section 386 is a question of law we review de novo.  (*Padres Hacia Una Vida Mejor v. Davis* (2002) 96 Cal.App.4th 1123, 1130.)  Our objective is to determine and effectuate the Legislature's intent.  (*People v. Woodhead* (1987) 43 Cal.3d 1002, 1007.)  "The statutory language itself is the most reliable indicator, so we start with the statute's words, assigning them their usual and ordinary meanings, and construing them in context."  (*Wells v. One2One Learning Foundation* (2006) 39 Cal.4th 1164, 1190.)  If the

8.

words are clear and unambiguous, the statute's plain meaning governs. (*Ibid*.) "Reviewing courts may turn to the legislative history behind even unambiguous statutes when it confirms or bolsters their interpretation."[2] (*In re Gilbert R*. (2012) 211 Cal.App.4th 514, 519.)

Section 386 was enacted as part of Senate Bill No. 1107 of the 1987–1988 Regular Session. (Stats. 1987, ch. 246, § 1.) The legislation was prompted by a case in Monterey County where the District Attorney had difficulty prosecuting a contractor who installed a fake sprinkler system in a chapel "by simply nailing or gluing sprinkler heads to the ceiling without connecting them to a water source." The same contractor was suspected of installing "phony" systems discovered in a hospital, a school, government buildings, and hotels. (Sen. Rules Com., Off. of Sen. Floor Analyses, 3d reading analysis of Sen. Bill No. 1107 (1987-1988 Reg. Sess.) as amended Apr. 20, 1987, p. 2; Assem. Com. on Public Safety, Rep. on Sen. Bill No. 1107, as amended Apr. 20, 1987, p. 2.) Existing law did not specifically criminalize the installation of an inoperable fire protection system.

The Legislature envisioned section 386 as a specific intent crime. The comments of the Senate Committee on the Judiciary are particularly illustrative of this point: "The key element of the proposed offense is the actor's specific intent to install a fire protection system known to be inoperable <u>or</u> to impair the effective operation of a system. The purpose of this provision is to additionally require that the actor intend to commit a specific evil before he can be convicted…. Without this specific intent element, the proposed offense would be a strict liability crime. In addition, the specific intent provision would protect against the inadvertent prosecution of incompetent building owners or contractors." (Sen. Com. on Judiciary, Rep. on Sen. Bill No. 1107 (1987-1988 Reg. Sess.) as amended Apr. 20, 1987, p. 5, original emphasis.)

---

[2] We grant Williams' unopposed request for judicial notice of the legislative history of section 386. (Evid. Code, §§ 452, subds. (b) & (c), 459, subd. (b).)

The plain language of section 386 reflects these legislative objectives. The statutory proscription of conduct done "willfully and maliciously" does not require proof of a specific intent. (*People v. Licas* (2007) 41 Cal.4th 362, 366.) Therefore, the first element of the offense is established if the defendant, acting with general intent, "constructs or maintains a fire-protection system in any structure." (§ 386, subd. (a).) In its ordinary usage and relevant context, "maintains" refers to the act of performing maintenance by caring for property or equipment; upkeep. (See Merriam-Webster's Collegiate Dict. (11th ed. 2011) p. 749; Black's Law Dict. (9th ed. 2009) p. 1039.)

The second element is the specific intent requirement. "A specific intent crime is one that requires the actor intend not only the proscribed act, but also that he intend some further act or additional consequence." (*People v. Cleaves* (1991) 229 Cal.App.3d 367, 380 (*Cleaves*).) Section 386 requires the defendant to act "with the intent to install a fire protection system which is known to be inoperable or to impair the effective operation of a system …." (§ 386, subd. (a).)

Finally, the defendant's actions must result in a threat to the safety of any occupant or user of the structure in the event of a fire. The legislative history characterizes this as a third element of the offense, separate from the specific intent requirement. (Sen. Com. on Judiciary, Rep. on Sen. Bill No. 1107, *supra*, at pp. 5-6.) The element is satisfied if the defendant's conduct endangers human safety, regardless of whether such a result was intended. (*Ibid*.)

The Legislature evidently included the intent to "impair the effective operation of a system" as an alternative basis for liability in order to "deal directly with the intentional act of disabling lifesaving devices." (Assem. Com. on Public Safety, Rep. on Sen. Bill No. 1107, *supra*, at p. 2.) This broadens the scope of the statute to prohibit not only the installation of a fake or non-functioning fire protection system, but also the act of intentionally impairing the effective operation of such a system. The verb "impair" means "to damage or make worse by or as if by diminishing in some material respect."

10.

(Merriam-Webster's Collegiate Dict., *supra*, at p. 622.) The ordinary, common sense meaning of the word is consistent with the Legislature's stated purpose.

The prosecution was correct insofar as the adjective "impaired" refers to "being in a less than perfect or whole condition." (Merriam-Webster's Collegiate Dict., *supra*, at p. 622.) However, section 386 does not use this language, nor does it speak of a defendant's knowledge that a fire protection system is in an "impaired" state. The indictments against Williams merged the alternate forms of culpability together, creating a misconception that persisted throughout the case. Each count under section 386 accused Williams of acting "with the intent to install or maintain a fire-protection system known to be inoperable or impaired." A similar conflation of the elements appeared in the jury instructions.

This construction of the statute is problematic for several reasons. First, there is nothing in section 386 or its legislative history to suggest it is unlawful for a contractor to maintain, i.e., perform maintenance on, a fire protection system that is known to be "impaired." It will often be the case that both the owner and the contractor are fully aware the system is "impaired," hence the engagement of the contractor's services. This was certainly true of Svenhard's vis-à-vis Williams and other contractors such as Jorgensen.

Secondly, allowing guilt or innocence to hinge upon the contractor's knowledge that a system remains in "less than perfect condition" after his services have been rendered comes close to being a rule of strict liability. This would have illogical and absurd consequences. (See *People v. Loeun* (1997) 17 Cal.4th 1, 9 ["'Interpretations that lead to absurd results … are to be avoided'"].) A proprietor or building owner may wish to hire the contractor not to achieve perfection, but only to repair a specific problem or ensure minimal functionality. The situation is analogous to that of a car owner dealing with a repair shop. The owner's request for an oil change does not mean he or she wants or can even afford all of the additional maintenance recommended by the mechanic.

11.

These scenarios are more than hypothetical; Ken Speck testified at trial that some customers were unable or unwilling to pay for additional repairs and upgrades to their systems even when deficiencies were brought to their attention.

In summary, we hold that section 386 is a specific intent crime. It must be shown that the defendant acted with specific intent to install a fire protection system which was known to be inoperable or specific intent to impair the effective operation of a fire protection system. Proof of the latter requires evidence of the defendant's intent to disable or diminish the effectiveness of the system in some material respect.

**B.      The Jury Instructions Were Erroneous**

Williams' claim of instructional error has merit. The jury was provided a specially prepared written instruction on the elements of section 386. The trial court also gave an oral instruction regarding the type of intent required for the offense. Both instructions were improper.

The special instruction was entitled "Inoperable or Impaired Fire Protection Systems." A prefatory statement advised that Williams was "charged with constructing or maintaining an inoperable or impaired fire protection system in violation of Penal Code section 386(a)." We have already explained why use of the word "impaired" in this context is incorrect.

The elements of the crime were described as follows:

> "1.      The defendant willfully or maliciously constructed or maintained a fire protection system;
>
> 2.      The defendant intended to install or maintain a fire protection system which was known to be inoperable or which was known to impair the effective operation of a system; and
>
> 3.      As a result of defendant's conduct, the safety of the occupant or user of the structure in which the fire protection system was located was threatened."

12.

None of these statements accurately correspond to the statutory language. The first sentence omits the requirement that the system be located in a "structure." (§386, subd. (a).) This is a necessary component of the offense. The word "structure" is defined at section 386, subdivision (d)(3)(5).

The second sentence misstates the law almost to the point of unintelligibility. Even the most generous reading suggests the fire protection system itself "was known to impair the effective operation of a system." More importantly, the instruction fails to identify and distinguish between the two forms of culpability set forth in subdivision (a). A defendant must have the intent "to install a fire protection system which is known to be inoperable or to impair the effective operation of a system." (Emphasis added.) The third sentence also deviates from the language of section 386 and is overbroad by omission of the phrase "in the event of a fire."

Further, it appears from the record that the jury did not receive written instructions explaining the concurrence of act and intent required for the crimes at issue. This does not constitute error in and of itself. (*People v. Samayoa* (1997) 15 Cal.4th 795, 845 [no federal or state constitutional right to instructions in writing].) However, the trial court's verbal instruction with respect to section 386 was a near verbatim recital of the standard instruction on general intent set forth in CALCRIM No. 250.[3] Given that section 386 is a specific intent crime, the trial court had a sua sponte duty to instruct the jury as to the requisite mental state. (*People v. Alvarez* (1996) 14 Cal.4th 155, 220 ["Even in the absence of a request, a trial court must deliver an instruction of this sort as to a given

---

[3] The instruction was as follows: "The crimes alleging the defendant maintained or serviced an inoperable or impaired fire suppression system require proof of the union or joint operation of act and wrongful intent. For you to find a person guilty of the crimes in this case, that person must not only commit the prohibited act, but must do so with wrongful intent. A person acts with wrongful intent while he or she intentionally does a prohibited act. However, it is not required that he or she intend to break the law. The act required is explained in the instruction for that crime."

13.

crime if it is one of 'specific intent.'"]; *Cleaves, supra,* 229 Cal.App.3d at p. 380, fn. 14 ["[T]he court must on its own motion give a specific intent instruction when a specific intent crime is charged."].)  Thus, the trial court erred by instructing the jury with CALCRIM No. 250, which defines general intent, instead of using an instruction such as CALCRIM No. 251, which defines specific intent.

Respondent contends Williams forfeited the right to appeal on instructional grounds.  Despite earlier objections, defense counsel acquiesced to the final version of the written instruction and did not challenge the oral instructions of the trial court.  Consequently, Williams would now need to show his substantial rights were affected.  (§ 1259; *People v. Salcido* (2008) 44 Cal.4th 93, 155; *People v. Anderson* (2007) 152 Cal.App.4th 919, 927.)  Since the issues are intertwined with our task of statutory interpretation, the foregoing discussion serves the interest of avoiding similar errors in future cases.  We need not decide if Williams' substantial rights were violated because, as explained below, the evidence was insufficient to support his convictions.

### C.    The Convictions Are Not Supported By Sufficient Evidence

The case against Williams was presented in two parts.  The first phase of trial focused on the work at Svenhard's involving the interior sprinkler system and replacement of the OS&Y valves outside the building.  The second phase pertained to Ken Speck's work on other customers' fire suppression systems.  Our analysis proceeds in the same manner.

We note that the facts of this case do not involve the installation of a fire protection system.  This was undisputed at trial and no such arguments have been advanced on appeal.  Respondent acknowledges all charges stemmed from Williams' repairs to the automatic sprinkler system at Svenhard's and his employee's inspection and maintenance of fire protection systems at other Tulare County businesses.  The question, therefore, is whether the evidence was sufficient to prove Williams acted with specific intent to impair the effective operation of an existing system.  We conclude it was not.

14.

1.    Standard of Review

"In resolving claims involving the sufficiency of evidence, a reviewing court must determine 'whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" (*People v. Marshall* (1997) 15 Cal.4th 1, 34 (*Marshall*).) Each element of the offense must be supported by substantial evidence. (*People v. Coffman and Marlow* (2004) 34 Cal.4th 1, 89; *People v. Misa* (2006) 140 Cal.App.4th 837, 842.) Evidence is substantial only if it "reasonably inspires confidence" and is of credible and solid value. (*People v. Raley* (1992) 2 Cal.4th 870, 891 (*Raley*).)

The same standard of review applies in cases, such as this one, where the prosecution relies primarily on circumstantial evidence. (*People v. Zamudio* (2008) 43 Cal.4th 327, 357.) "'Circumstantial evidence is like a chain which link by link binds the defendant to a tenable finding of guilt. The strength of the links is for the trier of fact, but if there has been a conviction notwithstanding a missing link it is the duty of the reviewing court to reverse the conviction.'" (*People v. Tripp* (2007) 151 Cal.App.4th 951, 956, quoting *People v. Redrick* (1961) 55 Cal.2d 282, 290.)

2.    Svenhard's Sprinkler System

The prosecution's theory of liability under section 386 was relatively simple. Williams, acting on behalf of American Fire Protection, performed maintenance on Svenhard's sprinkler system. However, he failed to complete a significant portion of the repairs to Risers 1 through 5 as promised under the parties' contractual agreement.

Each remaining deficiency, identified and explained during the case-in-chief, constituted evidence that the system was "impaired." Williams nevertheless told Svenhard's his work was finished. An experienced C-16 contractor such as Williams would have known his representations were untrue, and that the system was in an impaired state. Ergo, as respondent argues on appeal, "[a] jury could reasonably

15.

conclude [Williams] knew his work provided Svenhard's with a fire suppression system that operated in an impaired manner."

Proof of these facts came primarily from the testimony of two individuals with knowledge of the system's condition before and after Williams' involvement. The local fire inspector, Jerry Sterling, examined Svenhard's sprinkler system in May 2008 and again in September 2008. Kevin O'Neill, a C-16 contractor and manager of Jorgensen, assessed the system in February 2007, in May 2008 when his company submitted a bid for the repair work, and on multiple occasions in late 2008 and 2009 after American Fire Protection was kicked off the job.

Kevin O'Neill was asked to review and explain the contents of Jorgensen's 2007 inspection report and its 2008 proposal for repairs to Risers 1 through 6. These documents were admitted into evidence.[4] Mr. O'Neill's testimony described how the system was initially fraught with problems such as leaking pipes, broken water pressure gauges, painted sprinkler heads, non-functioning equipment, and other fire code violations.

Concerning the sprinkler heads, Mr. O'Neill explained that automatic sprinkler systems are designed to respond to heat. The sprinklers operate independently, activating as heat spreads across a given area. Each sprinkler head contains a heat-sensitive element which reacts at a certain temperature, thereby causing water to flow out of the sprinkler. Painting over a sprinkler head can result in poor heat detection and cause the sprinkler to malfunction.

---

[4] All exhibits admitted at trial are deemed part of the record in a criminal appeal. (Cal. Rules of Court, rule 8.320(e.)) At our request, the documentary exhibits in this case were transmitted by the trial court and reviewed as part of our analysis concerning the sufficiency of evidence in support of the section 386 convictions. (See Cal. Rules of Court, rule 8.224(d).)

Out of the 4,000-5,000 sprinkler heads in Svenhard's system, approximately 17 heads were noted to have paint on them. One of the obvious errors by American Fire Protection was its failure to replace the painted heads despite promising to do so in its contract. Jorgensen replaced the painted heads in 2009.

Kevin O'Neill's testimony also covered "post indicator valves" or "PIVs," which were discussed by a number of different witnesses. According to Mr. O'Neill and others, these valves control water flow to specific areas. A properly functioning PIV allows a particular zone to be shut down (e.g., to perform repairs) without impacting the distribution of water to other parts of the system. PIVs throughout Svenhard's facility were stuck or "frozen" in the open position. Although Jorgensen recommended replacing six of the PIVs entirely, Svenhard's chose the much cheaper option of having Williams attempt to lubricate the valves. Four PIVs were ultimately replaced by Jorgensen.

When the sprinkler system was re-evaluated following Williams' repair work, Mr. O'Neill found approximately 60% of the deficiencies had not been corrected. This estimate referred to the repairs originally recommended by Jorgensen. He never saw American Fire Protection's contract with Svenhard's, and thus lacked knowledge of the scope of work under their agreement.

According to Mr. O'Neill, a crew of four people working full time would need approximately six to eight weeks to complete the repairs to Risers 1 through 6 as originally bid by Jorgensen. Work on Riser 6 alone could have taken up to one month. In comparison, Williams and his employees spent an estimated two to three weeks repairing Risers 1 through 5. Mr. O'Neill had no criticisms of the repairs actually performed by American Fire Protection. The problem, he explained, was the number of defects and fire code violations which remained after Williams had supposedly finished his work.

Jerry Sterling estimated 50% of the fire code violations he had observed in May 2008 were present when he inspected the sprinkler system four months later. His

17.

testimony highlighted the problems involving PIVs, leaking pipes, and painted sprinkler heads. The sprinkler system was turned off at one point during his September 2008 evaluation (and thus "inoperable" at that time), which allowed him to confirm the water pressure gauges did not work.

Mr. Sterling concluded that the system, in the condition Williams had left it, would not have functioned as it was intended to function. Defense experts characterized Mr. Sterling's testimony as overblown and opined the system had no significant impediments. Either way, all evidence indicated the remaining deficiencies and fire code violations were pre-existing problems. In other words, the system was not functioning properly when Williams was hired.

There is an essential corollary to the testimony of the prosecution's witnesses. During the time American Fire Protection was on the job, Williams corrected upwards of 40% to 50% of the system's defects. This leads to the inescapable conclusion that Williams actually *improved* the effective operation of the sprinkler system, despite leaving it "impaired" or in "less than perfect" condition.

Performing suboptimal maintenance which leaves a fire protection system in less than perfect condition is not the same as intentionally disabling the system or worsening its effectiveness. Returning to the automobile analogy, a mechanic who falsely claims to have performed maintenance on a customer's vehicle commits an act of fraud punishable under various civil and criminal statutes. However, failing to complete all repairs as promised is materially different from a disabling act such as cutting the car's brake lines. The former shows knowledge of impairment, while the latter evidences a specific intent to impair.

Williams' business practices and ethics are certainly called into question by the underlying facts. The evidence presented at trial may reasonably support inferences of fraud, negligence, or incompetence. Viewing the record in the light most favorable to the

verdict, we do not find substantial evidence of a specific intent by Williams to impair the effective operation of the sprinkler system as contemplated by section 386.

### 3. The OS&Y Valves

When Jorgensen inspected Svenhard's facility in 2007, it discovered the main water valves for the building had been improperly installed decades earlier. The valves were buried underground and frozen in the open position. Kevin O'Neill explained: "The way that was set up originally wasn't really a legal system … you can't bury the type of valves that were in the ground…."

Williams identified this problem while developing his bid for the project. He agreed to replace the defective valves and raise them above ground for an additional charge of $4,000. To accomplish this task, Williams contacted a professional acquaintance named James Martinez.

James Martinez worked for a fire protection company called Casco. He was not personally licensed as a C-16 contractor, but had been in the industry for over 20 years and performed services under Casco's C-16 license as its employee. Mr. Martinez specialized in the installation of sprinkler systems and had replaced OS&Y valves on several occasions. When Williams contacted him about the valves at Svenhard's, Mr. Martinez said he was capable of handling the project.

The OS&Y valves installed at Svenhard's in 2008 were actually components of a piece of equipment known as a backflow preventer. According to expert witnesses, the purpose of such a device is to prevent water in the system from contaminating the potable water supply used by the general public. Having never installed or replaced this type of equipment, Williams subcontracted the work to James Martinez for $2,000. In addition to compensating Mr. Martinez, Williams provided the new backflow preventer, which would have reportedly cost at least a few thousand dollars.

The prosecution's original theory, as expressed in opening argument, was that Williams used the wrong type of device ("an improper piece of equipment" that "is

19.

actually not authorized for use in Tulare County"). When James Martinez was called as a prosecution witness, he confirmed Williams had selected and procured the backflow preventer himself. It turned out the prosecution's theory was incorrect, having been based upon an erroneous conclusion made by other Tulare County officials. It was conceded Williams used the correct equipment and there was "nothing functionally wrong" with the valves.

James Martinez testified that he was responsible for replacing and installing the new backflow preventer and OS&Y valves at Svenhard's. Williams provided unspecified assistance. Out of the $2,000 he received, Mr. Martinez paid an associate, Robert Johnson, $800 to help him complete the assignment. Mr. Johnson had similar experience installing and replacing water valves.

Mr. Martinez also consulted with his colleagues at Casco on various aspects of the project. The owner of Casco, a C-16 contractor named Ben Castillo, actually came out to the job site at one point. There was nothing in Mr. Martinez's testimony to indicate Williams instructed or expected him to perform his work incorrectly, or take any type of action to impair the functionality of Svenhard's sprinkler system.

Jerry Sterling was critical of Williams for failing to obtain a permit from Tulare County to replace the backflow preventer and for not contacting the fire department to inspect the work. In November 2008, Mr. Sterling and a district attorney investigator, Mark Lopez, addressed this issue with Williams during an undercover interview. The men posed as representatives from a "construction management company" hired by Svenhard's to oversee the renovation of its Exeter facility.

The first part of the interview was non-accusatory. Williams answered questions about his company and provided a summary of the maintenance performed up to that point. He assured them all work was guaranteed for one year and promised to fix any problems if the system did not pass inspection.

Mr. Sterling and Mr. Lopez eventually told Williams the fire marshal had contacted Svenhard's about a number of issues, including his company's failure to pull permits and submit plans to replace the OS&Y valves. Williams expressed surprise at this, and stated his understanding that permits were not necessary since he was replacing an existing device rather than performing new installations or construction. Williams also repeatedly asked for the contact information of fire officials who had made the complaints so he could discuss the matter with them directly.

At the conclusion of the interview, Mark Lopez told Williams he was fired from the project. Mr. Lopez also asked him to refrain from contacting Svenhard's project manager, Gene Dorough, or anyone else from the company. Williams subsequently called fire officials in Exeter to inquire about the permit requirements.

Several months later, in April 2009, Gene Dorough excavated an area near the backflow preventer where water was leaking from an underground pipe. A former contractor himself, Mr. Dorough performed the excavation using equipment which belonged to Fees Construction Company (Fees Construction). Fees Construction was already working on the building's plumbing and sewage system, and was eventually paid to fix the leak. Following an ill-advised recommendation by Tulare County officials, Svenhard's asked Fees Construction to replace the backflow preventer as well. In addition to labor, Svenhard's was charged approximately $8,000 for the new device; a Wilkins model 350ADA, which was the same equipment Williams had originally provided.

The backflow preventer and OS&Y valves were not the source of the water leak. The leak was caused by a misalignment in part of the plumbing structure several feet underground, which the prosecution argued was attributable to the work performed in August 2008. Kevin O'Neill's testimony indicated that Jorgensen was aware of a leak when it first began assessing the facility.

21.

Williams was also faulted for the dimensions of "thrust blocks" or "kickers" used in relation to piping connected to the backflow preventer. A thrust block, according to trial testimony, is a block of concrete placed against a pipe or valve to prevent movement and shifting caused by a sudden change in water pressure. Mr. Dorough specifically requested the addition of thrust blocks as the valve replacement work was nearing completion. Thrust blocks were added, but they were smaller than those later installed by Fees Construction. The parties' expert witnesses disagreed over whether the thrust blocks used by Williams were appropriate in size and/or would have provided adequate support under various hypothetical scenarios.

Several days' worth of testimony on the valve replacement issue can be summarized as follows: Williams identified a pre-existing problem with the building's main water valves and offered to fix it. He lacked the requisite skill and experience to do the job himself. Williams subcontracted the project to an individual who held himself out as possessing the necessary skills and experience. According to the subcontractor's own testimony, a good faith effort was made to perform the task correctly. The results were less than desirable, if not poor. Williams cut corners with regard to rules and regulations of the local jurisdiction, perhaps to save time and money, and made a bad choice in the selection of his subcontractor.

Section 386 does not impose strict liability for poor workmanship, nor does it proscribe acts of negligence or incompetence. If Williams intentionally misrepresented his own abilities with respect to the valve work, he may have taken Svenhard's money under false pretenses. These are the only conclusions that can be reasonably inferred from the evidence. The facts and circumstances do not constitute substantial evidence upon which a trier of fact could find, beyond a reasonable doubt, that Williams acted with specific intent to impair the effective operation of Svenhard's fire protection system.

Williams' conviction under Count 1 for violating section 386 must be reversed and dismissed on grounds of insufficient evidence. Double jeopardy protections preclude

22.

retrial. (*Burks v. United States* (1978) 437 U.S. 1, 9-11; *People v. Superior Court (Marks)* (1991) 1 Cal.4th 56, 72.)

4.     Hood Systems at Tulare County Businesses

Williams' remaining convictions under section 386 were in connection with Ken Speck's work on automatic fixed fire extinguishing systems for commercial kitchens, commonly known as hood systems. (See §386, subd. (d)(3).) From witness testimony and photographic exhibits, a hood system can be described as a stationary fire suppression system containing nozzles positioned over stoves, grills, and other cooking areas, essentially providing a protective "hood" or covering. These systems respond to heat, which is detected by fusible links designed to melt at a certain temperature. Once this occurs, the nozzles release a chemical extinguishing agent.

Ken Speck was trained by Williams to inspect and service hood systems and portable fire extinguishers. Approximately 60% of Mr. Speck's sales and services involved portable fire extinguishers, while the remaining 40% of his time was devoted to hood systems in restaurants and small businesses. His focus on these two areas is why, ironically, he did not participate in the sprinkler system repairs at Svenhard's.

Mr. Speck described part of his hood system training as follows: "[Williams] trained me to basically clean the nozzles, clean and check the fuse links; they are dated [and] are good for one year. Checked the cool station, make sure the spool was still connected. Check the temperature gauge on the chemical tank, and basically that was [the] service." Williams emphasized the importance of speed, setting a target time of 15 to 20 minutes per system (some establishments had multiple systems). A former employee of American Fire Protection testified that far more time is needed to provide proper service.

Hood system maintenance was performed in conjunction with an inspection of the system's components. Inspections were to follow a checklist found on all American Fire Protection invoices. The checklist covered thirteen items, with boxes next to each for the

23.

technician to mark "pass," "fail," or "corrected." The final item on the checklist was "UL300" compliance. The prosecution's case was anchored upon this particular requirement.

"UL300" refers to a testing standard for hood systems established by the company Underwriters Laboratories. It sets forth requirements for the design and function of a system, including the type of extinguishing agent that is used (wet chemical rather than dry chemical). The UL300 standard was adopted by the State of California in 2007. (California State Fire Marshal Information Bulletin re: State Fire Marshal Guidance For UL300 Compliance, December 20, 2008, available online at <http://osfm.fire.ca.gov/informationbulletin/pdf/2008/ul300compliancedeadline.pdf> [as of August 8, 2013].) Pursuant to section 904.11 of the 2007 California Fire Code, hood systems were required to be retrofitted or upgraded to meet UL300 compliance by the second required servicing of the system after January 1, 2008 (systems must be inspected every six months), and no later than December 31, 2008. (*Ibid.*)

The Tulare County task force, which included Jerry Sterling, inspected the hood systems of American Fire Protection customers in late 2008 and early 2009. The twenty-five businesses relevant to this case were found to have systems that did not meet UL300 requirements. The most common problem was the absence of a "micro-switch," which was described as a device that automatically disconnects gas and electricity from cooking appliances when the system is activated. Besides UL300 compliance issues, some of the systems had nozzles clogged by grease build up, fusible links that were out of date, and other problems which could have been remedied by proper servicing.

Although Ken Speck could not install UL300 systems or upgrades, it was his responsibility to document compliance problems and advise customers accordingly. His behavior was erratic in this regard. At least eight businesses were told their systems did not meet UL300 standards. More than half of the customers received invoices with UL300 compliance erroneously marked as a "pass" on the checklist.

24.

Mr. Speck had a habit of improperly "tagging" systems. Tagging refers to affixing tags or labels to equipment to indicate the system has passed inspection. A white tag means the system is fully certified (see Cal. Code Regs., tit. 19, § 906), while red tags indicate a failed inspection. Pursuant to his training, Mr. Speck used white tags even when a system did not pass inspection, but would leave the tag unsigned or write notes on the back indicating particular problems or deficiencies. There was evidence of such practices being a custom in the industry. However, the California Code of Regulations prohibits any use of a white tag unless all deficiencies have been corrected. (Cal. Code Regs., tit. 19, § 906, subd. (i).)

Mr. Speck also failed to submit the inspection and maintenance reports ("hood reports") required by section 904.2 of Title 19 of the California Code of Regulations. This section states, in pertinent part: "It is the responsibility of the contractor, company, or licensee to provide a written report of the test and maintenance results to the building owner and the local fire authority having jurisdiction at the completion of the testing and maintenance." (Cal. Code Regs., tit. 19, § 904.2 subd. (j).) According to Jerry Sterling, Mr. Speck could have satisfied the reporting requirement by simply providing copies of his invoices to local fire officials.

Holding Williams responsible for Ken Speck's behavior was a complicated endeavor. A significant obstacle was the fact that his employee acted alone. There was no evidence Williams had ever visited the business establishments in question, or had knowledge regarding the condition of the hood systems therein. Moreover, Ken Speck admitted Williams never requested or instructed that he impair the customers' systems in any way.

The prosecution claimed Williams aided and abetted Ken Speck in violating section 386 by providing inadequate training and equipment. Respondent advances the same position on appeal. The problem with this argument is the flawed interpretation of

the statute as a general intent crime requiring only knowledge a system is "impaired" at the time of maintenance or thereafter.

The crux of the aiding and abetting theory is Williams intended for Ken Speck to maintain the customers' systems, but failed to teach him to be sufficiently thorough in his maintenance. Therefore, Williams knew or should have known the systems would be in "less than perfect" condition at the conclusion of Mr. Speck's work. The aiding and abetting purportedly occurred through training and the provision of equipment, or lack thereof. According to the prosecution, every lingering deficiency and/or regulatory violation was evidence the systems were "impaired." Thus, all non-UL300 systems were characterized as impaired because they failed to meet the minimum requirements of the fire code.

Aiding and abetting is a specific intent crime that requires the aider and abettor to share the specific intent of the principal. (*People v. Beeman* (1984) 35 Cal.3d 547, 560.) Even Jerry Sterling admitted he found no evidence Ken Speck took affirmative steps to impair the hood systems or render them inoperable. Furthermore, Ken Speck's own testimony showed that any misconduct on his part in failing to provide maintenance was contrary to Williams' training. Mr. Sterling believed the deficiencies he observed, such as clogged nozzles and outdated fusible links, were present when the systems were serviced but had simply been ignored. Williams, on the other hand, trained his employees to clean the nozzles and replace any outdated fusible links, among other service tasks.

Intentional misrepresentations to businesses in terms of deficient systems passing inspection were also contrary to Ken Speck's training. He testified Williams never told him to be untruthful with anyone. Instead, he believed Williams expected him to be honest in his dealings with each customer.

The final point to address is Williams' alleged knowledge and/or intent that Ken Speck would violate State Fire Marshal's Regulations pertaining to inspection tags and

26.

hood reports.[5]  Even if Williams trained his employees to improperly tag systems and ignore reporting requirements, such conduct does not impair a fire protection system, nor does it show a specific intent to disable the system or worsen its effectiveness.  The hood systems were either "impaired" at the time of inspection or they were not.  If Ken Speck had refrained from tagging non-UL300 systems and filed appropriate hood reports, the systems would still have been non-compliant, and thus impaired, when he left the premises.  He could not force the customers to upgrade or replace their systems, and some cited financial reasons for their failure to do so.

These circumstances illustrate the untenable nature of the theory of liability against Williams.  A contractor who provides the highest quality of service on a non-UL300 system, inspects every component, informs the customer of existing deficiencies, and files the necessary inspection reports, has nevertheless maintained a fire protection system that is known to be impaired and leaves the system impaired when his or her work is complete.  Section 386 cannot be construed and applied in such a manner.

When the facts are analyzed to find specific intent to impair the effective operation of a system, proof is lacking.  This is not to say Williams or his company could not have been held accountable for Mr. Speck's conduct under other theories of criminal and civil liability.  On the charge of violating section 386, there is not substantial evidence to establish the elements of the offense beyond a reasonable doubt.  This requires reversal and dismissal of the convictions under Counts 6, 10, 12, 16, 20, 24, 25, 29, 33, 43, 47, 48, 55, 59, 66, 70, 74, 77, 80, 83, 86, 89, 92, 97, and 101, with retrial barred.

---

[5] This was apparently the basis for some of the misdemeanor convictions under Health & Safety Code section 13195.  The sufficiency of the evidence supporting Williams' misdemeanor convictions is not discussed in his briefing.  Consequently, the issue will not be considered.  (*Padilla v. Rodas* (2008) 160 Cal.App.4th 742, 753, fn. 2 [issues not raised in the opening brief are waived].)

5.    Conspiracy

Williams was convicted under Count 112 of conspiracy to violate section 386 in relation to the conduct of Ken Speck as previously described.  A criminal conspiracy exists where there is an unlawful agreement between two or more people to commit a crime, and an overt act in furtherance of the agreement.  (§ 182, subd. (a)(1); *People v. Prevost* (1998) 60 Cal.App.4th 1382, 1399 (*Prevost*).)  "Conspiracy is a specific intent crime, with the intent divided into two elements: the intent to agree or conspire, and the intent to commit the offense which is the object of the conspiracy."  (*People v. Martin* (1982) 135 Cal.App.3d 710, 722.)  There must be substantial evidence to show the conspirators not only intended to agree, but also intended to commit the elements of the target offense.  (*Prevost*, *supra*, 60 Cal.App.4th at p. 1399.)

Our analysis of Count 112 is the same as stated above for the section 386 convictions obtained under a theory of aiding and abetting.  Substantial evidence of the requisite intent is missing.  Therefore, the conspiracy conviction must be reversed and dismissed, with retrial barred.

**Unlawful Diversion of Funds (§ 484b)**

Williams' conviction under section 484b is reviewed for substantial evidence.  As previously stated, the applicable standard of review requires the record to be construed in the light most favorable to the verdict.  (*Marshall*, *supra*, 15 Cal.4th at p. 34.)  We conclude the evidence was sufficient to support the jury's finding of guilt.

Section 484b prohibits the unlawful diversion of funds received for improvements.  The law states: "Any person who receives money for the purpose of obtaining or paying for services, labor, materials or equipment and willfully fails to apply such money for such purpose by either willfully failing to complete the improvements for which funds were provided or willfully failing to pay for services, labor, materials or equipment provided incident to such construction, and wrongfully diverts the funds to a use other

than that for which the funds were received, shall be guilty of a public offense…" (§ 484b.)

The classic example of the offense is where a contractor fails to use construction funds to pay laborers and suppliers on a particular project, or diverts such funds for use on a different project. (See, e.g., *People v. Howard* (1969) 70 Cal.2d 618, 620-621; (*People v. Worrell* (1980) 107 Cal.App.3d 50, 55 (*Worrell*).) The statute is broadly construed to prohibit the diversion of funds to any use "other than bona fide project costs." (*People v. Butcher* (1986) 185 Cal.App.3d 929, 938 (*Butcher*).) Wrongfully diverting funds simply means "not applying the funds for the purpose for which they were disbursed." (*People v. Stark* (1994) 26 Cal.App.4th 1179, 1184 (*Stark*).)

Section 484b is a general intent crime. (*Stark, supra,* 26 Cal.App.4th at p. 1182.) The elements are satisfied when a wrongful diversion is the cause of the contractor's failure to complete the agreed upon work, or failure to pay for the associated labor, materials, or equipment. (*Ibid.*) Stated differently, "liability attaches when the contractor fails to either complete the improvements or pay the costs therefor with the money obtained for that purpose." (*Worrell*, *supra*, 107 Cal.App.3d at p. 56.)

Williams' arguments with respect to the diversion element are confusing and unpersuasive. He believes the jury relied heavily upon Kevin O'Neill's estimate that only 40% of the sprinkler system repairs originally recommended by Jorgensen were completed. Williams contends the estimate was misleading because Mr. O'Neill did not see the contract between Svenhard's and American Fire Protection, which defined the relevant scope of work. This is a valid point. However, the jury *did* see both contracts.

Jorgensen's proposal of May 8, 2008 was admitted into evidence as People's Exhibit No. 1. The July 28, 2008 contract between Svenhard's and American Fire Protection was admitted as People's Exhibit No. 11. People's Exhibit No. 8 was a copy of Jorgensen's February 25, 2009 proposal for repair work after Williams had been fired.

Each document provides a detailed, itemized list of the anticipated repairs to Risers 1 through 6 of the sprinkler system.

A side-by-side comparison of these exhibits paints a stark picture. Although Jorgensen's bids listed some repairs not included on the American Fire Protection contract, the proposed work was extremely similar. In most instances, Jorgensen and Williams provided identical descriptions of the repairs for each riser, listed in the same exact order. The jury could reasonably find that any repairs which were listed in all three documents, i.e., before and after Williams' involvement, were not performed by Williams as promised (excluding work on Riser 6).

A comparison of the proposed work involving sprinkler heads, to use just one example, could be seen as incriminating. Jorgensen's 2008 proposal and American Fire Protection's contract both called for the replacement of twelve painted sprinkler heads in Riser 4, plus the addition of four new heads in the southwest corner of the same riser. Jorgensen listed the same items on its 2009 bid, thus indicating the task was not completed by Williams. Similar examples abound.

It would be reasonable to conclude Williams failed to use Svenhard's deposit and progress payments to purchase the materials necessary to complete the project. Another permissible inference is work on Risers 1 through 5 was not completed because Williams failed to pay the labor costs necessary to ensure adequate time and effort were devoted to the project. It does not matter that some of the work was actually performed. If all funds received are not earned or used for bona fide project costs, there is evidence of an unlawful diversion. (See *Butcher*, *supra*, 185 Cal.App.3d at p. 938.) The jury apparently believed Williams diverted funds by retaining a portion of the payments he had no right to keep.

Moving to the causation element, Williams argues any failure to complete the sprinkler system repairs was not due to a diversion of funds, but because he was prematurely fired from the job. The evidence compels a different conclusion. Williams'

representation that all work was complete on Riser 1 through Riser 5 was expressed to Svenhard's in no uncertain terms. Gene Dorough attested to this at trial, and Williams can be heard during the November 2008 undercover interview stating, "all work has been done except, up to Riser 6." There is substantial evidence to find the elements of the offense were met at the time Williams' representations were made. The conviction under Count 2 is affirmed.

## Grand Theft (§ 487, subd. (a))

In challenging the grand theft conviction, Williams directs us to his arguments for reversal of the unlawful diversion conviction under Count 2. We, too, apply a similar analysis. There is sufficient evidence to support the conviction.

Section 484 defines theft generally. The definition includes the act of "knowingly and designedly, by any false or fraudulent representation or pretense, defraud[ing] any other person of money, labor or real or personal property…." (§ 484, subd. (a).) Grand theft is a higher degree of the offense, which occurs "[w]hen the money, labor, or real or personal property taken is of a value exceeding nine hundred fifty dollars." (§ 487, subd. (a); *People v. Ortega* (1998) 19 Cal.4th 686, 696.)

The prosecution's theory was theft by false pretenses. This requires proof that "(1) the defendant made a false pretense or representation to the owner of property; (2) with the intent to defraud the owner of that property; and (3) the owner transferred the property to the defendant in reliance on the representation." (*People v. Wooten* (1996) 44 Cal.App.4th 1834, 1842.)

Williams' statement regarding the completion of work on Risers 1 through 5 is a false representation if one finds, as the evidence permits, the statement was untrue. This satisfies the first element. The third element is met by the undisputed fact that Svenhard's disbursed two progress payments to Williams in reliance upon his misrepresentation.

31.

The second element of the offense requires specific intent to defraud, which is often proven by circumstantial evidence. (*People v. Abilez* (2007) 41 Cal.4th 472, 508; *People v. Wright* (1962) 199 Cal.App.2d 30, 40.) Among the many circumstances the jury could have considered was the fact Williams had been a licensed C-16 contractor since 1996. His years of experience and specialized knowledge strongly suggest he knew the agreed upon repairs were not finished. Yet he provided further assurances to Svenhard's managers by conducting a walk-through of the risers, pointing out what had been fixed and apparently concealing his knowledge of the remaining deficiencies.

Further evidence of the intent to defraud is found in the extent of work left unfinished or never even started. The testimony of Kevin O'Neill and Jerry Sterling was bolstered by the trial exhibits. Considering all of the facts and circumstances under the applicable standard of review, there is substantial evidence to support the conviction of grand theft under Count 3.

## Enhancement For Victims' Losses in Excess of $65,000 (§ 12022.6, subd. (a)(1))

The jury found true a special enhancement allegation under section 12022.6 for victims' losses in excess of $65,000. This statute imposes a consecutive one-year prison term in addition to the sentence prescribed for the predicate felony conviction(s). (§ 12022.6, subd. (a)(1).) Williams contends the true finding was without evidentiary support. Respondent argues the contrary.

Interestingly, neither Williams nor the Attorney General seems to have noticed that the trial court failed to impose a sentence on the special enhancement finding. "The failure to impose or strike an enhancement is a legally unauthorized sentence subject to correction for the first time on appeal." (*People v. Bradley* (1998) 64 Cal.App.4th 386, 391.) Were we to affirm the jury's finding, the matter would be remanded to the trial court with instructions to impose the appropriate sentence or exercise its discretion to strike the enhancement in accordance with section 1385, subdivision (a). However, the true finding was not supported by substantial evidence. For the reasons set forth below,

32.

the sentencing enhancement under section 12022.6, subdivision (a)(1), is reversed and dismissed.

## 1. Standard of Review

The sufficiency of evidence to support a sentencing enhancement is reviewed under the same standard used to evaluate the sufficiency of evidence for a conviction. (*People v. Livingston* (2012) 53 Cal.4th 1145, 1170.) We presume every fact the jury could have reasonably inferred from the evidence. (*Ibid*.) "A reasonable inference, however, may not be based on suspicion alone, or on imagination, speculation, supposition, surmise, conjecture, or guess work. A finding of fact must be an inference drawn from evidence rather than a mere speculation as to probabilities without evidence." (*Raley*, *supra*, 2 Cal.4th at p. 891, internal quotation marks and ellipses omitted.)

## 2. Applicable Law

In pertinent part, section 12022.6 provides: "When any person takes, damages, or destroys any property in the commission or attempted commission of a felony, with the intent to cause that taking, damage, or destruction, the court shall impose an additional term as follows: [¶] (1) If the loss exceeds sixty-five thousand dollars ($65,000), the court … shall impose an additional term of one year." (§ 12022.6, subd. (a)(1).)

A section 12022.6 enhancement must be proven beyond a reasonable doubt. (*People v. Kellett* (1982) 134 Cal.App.3d 949, 958, fn. 2.) The value of property taken, damaged, or destroyed is measured by fair market value. (*People v. Swanson* (1983) 142 Cal.App.3d 104, 107; see also, § 484, subd. (a).) Proving the value of property can be relatively simple in cases where a tangible item is stolen, such as jewelry, or a robber absconds with a certain amount of cash.

A mechanical application of the statute is far more difficult in the seemingly rare situation where the enhancement is alleged because a victim overpaid for professional services. The receipt of inherently valuable services, if specifically requested by the recipient, cannot be construed as a loss in and of itself. Therefore, in order to meet its

burden, the prosecution must somehow distinguish between the fair market value of the services received by the victim and the amount of money fraudulently obtained by the defendant for work he did not perform.

The closest case we have found to guide our analysis is the California Supreme Court's opinion in *People v. Crow* (1993) 6 Cal.4th 952 (*Crow*).  The defendant in *Crow* aided and abetted the mother of his children in the fraudulent taking of welfare benefits from the Lake County Department of Social Services.  A sentencing enhancement was imposed under a former version of section 12022.6, subdivision (a), which set the threshold of loss at $25,000.  (*Crow*, *supra*, 6 Cal.4th at p. 955.)  The government agency paid nearly $33,000 in welfare benefits during the time period at issue.  (*Id*. at p. 961.)

On appeal, the defendant argued the agency's loss was not the full amount of benefits it had paid, but rather the amount in excess of what the recipient was rightfully entitled to receive based upon her welfare eligibility.  (*Crow*, *supra*, 6 Cal.4th at p. 955.)  The Supreme Court agreed with this argument.  The opinion states: "Defendant is right that in determining whether to impose the one-year sentence enhancement of Penal Code section 12022.6, subdivision (a), the defrauded agency's 'loss' should be calculated by subtracting the amount the government would have paid had no acts of fraud occurred from the amount the government actually paid.  Any money that the government would have been obligated to pay had the fraud not occurred is not attributable to the fraud, and thus is not a 'loss' arising out of the criminal offense."  (*Id*. at pp. 961-962.)

In *Crow*, the defendant's enhancement was affirmed because he failed to actually establish the welfare eligibility of the woman who received the benefits.  (*Crow*, *supra*, 6 Cal.4th at p. 962.)  Here, it is undisputed that Williams performed valuable services and repairs with regard to Svenhard's sprinkler system.  We thus employ the principles recognized in *Crow* to analyze the evidence in support of the section 12022.6 enhancement.  First, however, we must address another issue raised by respondent concerning the concept of "loss" under the statute.

Respondent contends the calculation of Svenhard's loss from Williams' felonious taking of property must include (1) the amount of money Williams unlawfully received from Svenhard's under false pretenses and (2) all amounts subsequently paid to Jorgensen and Fees Construction to finish or repair Williams' work. A recent decision by the Fourth District holds otherwise. In *People v. Evans* (2013) 215 Cal.App.4th 242 (*Evans*), the legislative history of section 12022.6 was examined and relied upon in support of the appellate court's conclusion that "loss," as used in the statute, was intended by the Legislature "to mean the value of the property taken, damaged, or destroyed, and not to include other types of economic losses suffered by the victim." (*Evans*, *supra*, 215 Cal.App.4th at p. 253.)

The *Evans* defendant was found guilty of multiple felonies, including grand theft. Sentencing enhancements were imposed pursuant to subdivisions (a)(1) and (a)(2) of section 12022.6 for victims' aggregate losses exceeding $65,000 and $200,000, respectively. The defendant argued the jury improperly calculated the victim company's lost income and lost profits to reach the $200,000 threshold under subdivision (a)(2). (*Evans*, *supra*, 215 Cal.App.4th at p. 250.) Although the evidence in support of the enhancement was deemed sufficient, the court held that consequential or "economic" losses cannot be factored into the equation. In other words, the victim's "loss" must relate solely and directly to the property taken, damaged, or destroyed. (*Id*. at pp. 252-253.)

Briefing in the present appeal was completed well before the *Evans* opinion was published. Respondent's arguments rely on a case from the Third District, *People v. Beaver* (2010) 186 Cal.App.4th 107 (*Beaver*). We do not read *Beaver* as being in conflict with *Evans*.

The *Beaver* case involved a defendant who defrauded his employer by faking a workplace accident in order to receive medical care for a pre-existing condition. (*Beaver*, *supra*, 186 Cal.App.4th at pp. 111-113.) For purposes of section 12022.6, the employer's

loss of property by defendant's fraudulent conduct was calculated using the cost of the medical bills paid in reliance upon the misrepresentation, as well as legal fees the employer incurred because of a related insurance coverage issue. (*Id*. at pp. 113.) Under the particular facts of the case, the court found the legal bills were "inextricably intertwined" with the employer's expenditures for the defendant's medical care. (*Id*. at p. 118.) Therefore, all payments were part of the same loss of property. (*Ibid.*)

There are no similarities between this case and *Beaver*. The *Beaver* opinion can be harmonized with *Evans* because the victim's legal fees were essentially construed as part of the property taken rather than a separate and consequential loss. Respondent's arguments, on the other hand, are directly at odds with the holding in *Evans*.

3.      Insufficient Evidence of a $65,000 Loss

We begin our analysis by determining the amount of money taken from Svenhard's in relation to the grand theft and unlawful diversion convictions. According to Svenhard's accountant and other witnesses, Williams received a total of three payments. The first payment was a check for $36,079.32. A portion of the check, specifically $6,079.32, was for the purchase of new fire extinguishers.

There was no evidence to suggest any impropriety surrounding Williams' receipt of the $6,079.32 for fire extinguisher sales. Williams was also acquitted of all misdemeanor charges alleging violations of State Fire Marshal's Regulations for portable fire extinguishers. Therefore, the $6,079.32 cannot be characterized as ill-gotten gains or a "loss" of property for purposes of section 12022.6.

The remaining $30,000 corresponds to the initial deposit required under the parties' contract. Next, Williams was given a check for $48,000. This amount corresponds to the contractual language calling for two progress payments of $24,000 for work on Risers 1 through 5. Finally, Svenhard's issued a $4,000 check for the backflow preventer/OS&Y valve replacement. Adding the payments together, Svenhard's paid Williams a total of $82,000.

The prosecution's own evidence establishes Williams was entitled to at least some portion of the $82,000 he received. According to Kevin O'Neill and Jerry Sterling, Williams fixed 40% to 50% of the deficiencies in the sprinkler system. At one point the prosecutor told the jury, "40% of that $82,000 he lawfully earned. That would leave approximately $33,000 left that he didn't earn. That is property that he took during the commission of these crimes … I am sorry, he got credit for $33,000, there is $49,000 left over that he took."

Setting aside the fallacious underpinnings of this calculation, the math does not add up to a $65,000 loss of property. Forty percent of $82,000 is $32,800. If subtracting $32,800 from the total amount paid to Williams equals Svenhard's loss, the amount is $49,200.

The prosecution also highlighted an admission made by Williams during an interview with investigator Mark Lopez. Williams told Mr. Lopez he had spent "a little over $20,000" on labor and materials for the sprinkler system work at Svenhard's. Taking this statement at face value, and even assuming Williams was working for Svenhard's at cost (not a reasonable assumption), subtracting $20,000 from $82,000 leaves $62,000. The $65,000 threshold is still not met.

After closely examining the entire record, the only probative evidence we are able to find is the testimony and trial exhibits pertaining to Jorgensen's work on the sprinkler system in 2009. This evidence shows what Svenhard's was required to pay to a second contractor to obtain the results it should have received from Williams in the first place. Jorgensen's completion of the tasks left unfinished by Williams cost Svenhard's $29,014.50.[6] Since Williams and Jorgensen had bid on substantially the same work,

_____

[6] Because it is discussed in the briefs, we note that under a separate contract Svenhard's paid Jorgensen $40,560 to replace four post indicator valves (PIVs). As explained in an earlier portion of the opinion, the replacement of PIVs was excluded from the contract between Svenhard's and American Fire Protection. Gene Dorough

including the work Williams completed, the logical conclusion is that Williams earned and/or was entitled to somewhere in the neighborhood of $50,000 of the $82,000 he was paid.

Following the principle discussed in *People v. Crow*, *supra*, any money Svenhard's would have been obligated to pay Williams in the absence of fraud is not attributable to his fraudulent behavior, and cannot be deemed a "loss" for purposes of section 12022.6 (*Crow, supra,* 6 Cal.4th at pp. 961-962.) The total value of the property taken by Williams was $82,000. To prove the section 12022.6 enhancement allegation, the prosecution needed to show, at a minimum, that the fair market value of the services provided by Williams did not exceed $17,000. The record does not disclose any possible basis upon which such a conclusion could be reached outside of mere suspicion or guesswork.

Williams was charged with a total of 112 felony and misdemeanor counts in the First Amended Indictment. By adding the section 12022.6 enhancement to those charges, the prosecution accepted the burden of proving the allegation beyond a reasonable doubt. Viewing the record in the light most favorable to the judgment, we cannot conclude the burden was met. The true finding under section 12022.6, subdivision (a), is reversed and dismissed on grounds of insufficient evidence.

**Allegations of Prosecutorial Misconduct and Prejudicial Evidence**

During trial, the prosecution was permitted to argue that Williams engaged in a pattern of "targeting minority businesses." Williams spoke English and Spanish. Former

---

confirmed the amount of Williams' original proposal was approximately $135,000 and included the replacement of PIVs. After further negotiations, the parties agreed Williams would lubricate the valves instead of replacing them, which brought the final contract price down to $98,000. Because Williams never promised to replace any PIVs, the amount of money Svenhard's later paid to Jorgensen for that work has no relevance to the section 12022.6 analysis.

employees said they were instructed to focus their sales efforts on Hispanic and Asian customers because these groups were perceived as eager to comply with the law, easily intimidated, and often paid with cash. In closing argument, the prosecutor commented upon this evidence and opined Williams' behavior was "racist."

Williams argues the trial court abused its discretion by allowing irrelevant testimony about the solicitation of business from customers of a certain ethnic background. He further alleges prosecutorial misconduct in the form of an impermissible appeal to racial passions or prejudice. We find if error occurred in either form, it did not result in a miscarriage of justice.

"Absent fundamental unfairness, state law error in admitting evidence is subject to the traditional *Watson* test: The reviewing court must ask whether it is reasonably probable the verdict would have been more favorable to the defendant absent the error." (*People v. Partida* (2005) 37 Cal.4th 428, 439, citing *People v. Watson* (1956) 46 Cal.2d 818, 836.) Given our reversal of the convictions which involved small businesses owned by minorities, Williams' arguments are largely, if not entirely, moot. The convictions of grand theft and unlawful diversion of funds in relation to the Svenhard's project did not involve minority groups. The evidence in support of those convictions is substantial and stands on its own. There is nothing in the record or the arguments presented on appeal to suggest a reasonable probability that the outcome of Counts 2 and 3 would have been more favorable to Williams absent admission of the evidence in question.

To show a federal constitutional violation based upon references to race during closing argument, Williams would need to establish that the prosecutor's behavior comprised "'a pattern of conduct "so egregious that it infect[ed] the trial with such unfairness as to make the conviction a denial of due process."'" (*People v. Gionis* (1995) 9 Cal.4th 1196, 1214-1215.) To establish prosecutorial misconduct under state law, he must show the prosecutor resorted to "the use of deceptive or reprehensible methods to

39.

attempt to persuade either the court or the jury." (*Id.* at p. 1215, quotation marks and citations omitted.)

Williams has not shown a violation of his constitutional rights by prosecutorial misconduct. His arguments are based upon a single remark at the end of a five-week trial rather than a pattern of egregious conduct. The judge sustained a timely objection by defense counsel and the jury was instructed to disregard the prosecutor's comment.

Under the state law standard, Williams still falls short of establishing grounds for reversal. "Reversal of a judgment of conviction based on prosecutorial misconduct is called for only when, after reviewing the totality of the evidence, we can determine it is reasonably probable that a result more favorable to a defendant would have occurred absent the misconduct." (*People v. Castillo* (2008) 168 Cal.App.4th 364, 386.) No explanation is given as to how the outcome of the case would have been different had the prosecutor not said she thought it was racist for Williams to seek out Hispanic and Asian customers. There is certainly no evidence that any of the people he dealt with at Svenhard's were minorities.

Williams also overlooks the fact that he was acquitted of twenty-three charges, including five felony counts of violating section 386. We see this as a strong indication that the jury remained objective despite any disparaging remarks by the prosecutor or arguments which appealed to racial sensitivities. Since Williams offers no convincing arguments or proof to the contrary, we do not find the existence of any prejudicial conduct that warrants reversal.

**Alleged Juror Misconduct**

Shortly following the conclusion of the prosecution's case-in-chief, a local newspaper published an article about the ongoing trial. There was a statement in the article to the effect that Williams was not offered a plea bargain by the District Attorney's Office. This prompted an inquiry by the trial court into whether the

prosecution had improperly leaked information to media. The jury was questioned individually in an effort to determine if anyone had actually read the article.

One juror admitted to reading the article, and was excused as a result. A second juror was allegedly made aware of the article by the juror who was excused, but this was never confirmed. The second juror unequivocally denied reading the article. This juror was permitted to remain on the jury over the objections of defense counsel. Williams now argues for reversal on the basis of these facts.

"As a general rule, juror misconduct 'raises a presumption of prejudice that may be rebutted by proof that no prejudice actually resulted.'" (*People v. Majors* (1998) 18 Cal.4th 385, 417 (*Majors*).) "[When alleged juror misconduct] involves the receipt of information from extraneous sources, the effect of such receipt is judged by a review of the entire record, and may be found to be non-prejudicial. The verdict will be set aside only if there appears a substantial likelihood of juror bias." (*People v. Danks* (2004) 32 Cal.4th 269, 303.)

Williams' arguments presume the existence of juror misconduct in the absence of proof that improper behavior occurred. The juror who was permitted to stay on the jury denied reading the article at issue. The trial court accepted the veracity of her statements, and we are deferential to such credibility determinations unless they are unsupported by substantial evidence. (*People v. Nesler* (1997) 16 Cal.4th 561, 582.) Williams fails to show grounds for a departure from the standard of deference.

Reasonable minds may differ as to what inferences, if any, a layperson would draw from the fact that a criminal defendant was not offered a plea deal. Assuming the juror in question even read the article, which is entirely speculative itself, we find nothing in the record to indicate a substantial likelihood of prejudicial bias against Williams. As previously stated, all available information suggests this jury was conscientious and objective. Williams has not carried his burden to establish reversible error on the basis of juror misconduct.

**Ineffective Assistance of Counsel**

To prevail on an ineffective assistance of counsel claim, the appellant must establish two things: (1) the performance of his or her counsel performance fell below an objective standard of reasonableness, and (2) that prejudice occurred as a result. (*Strickland v. Washington* (1984) 466 U.S. 668, 687;  *People v. Hernandez* (2012) 53 Cal.4th 1095, 1105; *People v. Bradley* (2012) 208 Cal.App.4th 64, 86-87.)

Williams' claim of ineffective assistance of counsel is based upon the notion that his attorney did not perform a sufficiently thorough and/or effective cross-examination of Jorgensen's manager, Kevin O'Neill.  More specifically, Williams believes his attorney should have gone to greater lengths in pointing out Mr. O'Neill's estimate regarding the percentage of deficiencies corrected by Williams was based upon Jorgensen's original bid rather than the contract between Svenhard's and American Fire Protection.  As a secondary argument, Williams contends the American Fire Protection contract should have been entered into evidence as a defense exhibit.

There is no merit to Williams' arguments on this issue.  He simply doubts the jury appreciated the significance of the evidence presented.  All relevant contracts were admitted into evidence during the prosecution's case in chief.  There was no reason for defense counsel to make a duplicative effort in that regard.  As for the reliability and accuracy of Mr. O'Neill's estimate, his lack of knowledge regarding Williams' contract was plainly stated.

Mr. O'Neill's testimony on direct examination provided a detailed account of the deficiencies in each riser of the system before and after Williams worked on the project.  One can easily see the logic behind a tactical decision to avoid any replay of such damaging testimony on cross-examination, or exacerbating the effects of same by engaging in a line-by-line comparison of the contracts.  The record does not affirmatively disclose the lack of a rational, tactical purpose for the challenged acts or omissions of Williams' attorney.  (See *Majors, supra,* 18 Cal.4th at p. 403.)

To prevail on his arguments, Williams must establish "there is a reasonable probability that, but for counsel's unprofessional errors, a determination more favorable to [him] would have resulted." (*People v. Rodrigues* (1994) 8 Cal.4th 1060, 1126.) The conduct complained of cannot reasonably be characterized as unprofessional error, much less error upon which the entire determination of guilt or innocence was based. Williams has thus failed to demonstrate he is entitled to a new trial on the ground of ineffective assistance of counsel.

## DISPOSITION

Williams' Request for Judicial Notice is granted. The section 386 convictions under counts 1, 6, 10, 12, 16, 20, 24, 25, 29, 33, 43, 47, 48, 55, 59, 66, 70, 74, 77, 80, 83, 86, 89, 92, 97, and 101 are reversed and dismissed for lack of sufficient evidence. The count 112 conviction for conspiracy to violate section 386, as well as the true finding of the sentencing enhancement under section 12022.6, subdivision (a)(1), are likewise reversed and dismissed for lack of sufficient evidence. The judgment is affirmed as to all other convictions.

The matter is remanded to the trial court for reconsideration of Williams' application for probation and for further proceedings consistent with this opinion, including recalculation of Williams' scheduled date of release from custody. Any fines paid in connection with the counts that have been reversed and dismissed on appeal shall be returned to Williams in accordance with section 1262.

The trial court is directed to prepare an amended abstract of judgment reflecting the deletion of Williams' convictions under the counts described above. In doing so, it should also correct the error in the current abstract which incorrectly states Williams was

43.

convicted and sentenced under count 13 for violating section 386. Count 13 charged Williams with misdemeanor petty theft, and was dismissed by the trial court pursuant to section 1118.1 for lack of sufficient evidence. The trial court shall send a certified copy of the amended abstract to the Department of Corrections and Rehabilitation.


_____

Gomes, J.

I CONCUR:


_____

Cornell, Acting P.J.

**POOCHIGIAN, J., CONCURRING**

I concur in the reversal of the Penal Code[1] section 386 counts and the related conspiracy conviction.  I also concur in the affirmance of the remaining convictions, but do so with significant misgivings and concern over the number of meritless counts brought to trial.  (See *U.S. v. Smith* (5th Cir. Aug. 11, 1993, No. 92-1612) 1993 WL 346875 [nonpub. opn.].)[2]

**Quantity of Charges**

Initially, the People filed a complaint against defendant alleging civil violations of Business and Professions Code sections 17200 and 17500.  Eventually, the prosecution pursued criminal charges.  Defendant was indicted on 112 counts.  The prosecution dismissed 11 counts after presenting its case-in-chief at trial.  The trial court dismissed 24 counts on a defense motion.  The jury acquitted defendant on 22 counts.  We now reverse and dismiss 27 counts.  In their long trek from indictment to appeal, only two felony counts survived.

The disposition of 84 counts in defendant's favor raises the question of whether the remaining counts "may stand despite the taint introduced by … unfounded counts …."  (*U.S. v. Smith*, *supra*, 1993 WL 346875.)  My concern relates to the due process implications of the prospect that the jury looked at the sheer volume of counts and concluded defendant must be guilty of something.

---

[1] All further statutory references are to the Penal Code unless otherwise stated.

[2] This is an unpublished federal case, but it is nonetheless citable.  (*Nungaray v. Litton Loan Servicing, LP* (2011) 200 Cal.App.4th 1499, 1501, fn. 2; *Kight v. CashCall, Inc.* (2011) 200 Cal.App.4th 1377, 1394, fn. 3; *People v. Evans* (2011) 200 Cal.App.4th 735, 752, fn. 11; *Hellum v. Breyer* (2011) 194 Cal.App.4th 1300, 1312, fn. 5; *Discover Bank v. Superior Court* (2005) 134 Cal.App.4th 886, 892, fn. 2; *Hillman v. Britton* (1980) 111 Cal.App.3d 810, 816, fn. 2.)

**<u>Evidence and Argument that Defendant's Conduct Motivated by Race</u>**

The number of charges was not the only potential source of unwarranted effect on the jury's reasoning. There was evidence offered during trial that included accusations related to race. For example, a former employee alleged defendant targeted sales efforts on certain ethnic groups. In closing argument, the prosecutor said defendant's behavior was "racist." Defendant contends the evidence and comment were improper and prejudicial.

The majority concludes defendant's arguments on this issue "are largely, if not entirely, moot" because the circumstances underlying the grand theft and diversion convictions "did not involve minority groups." (Maj. opn. at p. 39.) I am not so certain. In fact, the circumstances may strengthen defendant's undue prejudice argument.

The definition of prejudicial evidence in this context is that " 'which uniquely tends to evoke an emotional bias against the defendant as an individual and which has very little effect on the issues.…' " (*People v. Karis* (1988) 46 Cal.3d 612, 638.) The evidence of racial motivation had even less "effect on the issues" (*id.*) as to the grand theft and diversion counts precisely because they "did not involve minority groups." (Maj. opn. at p. 39.) The result being the evidence could arguably be *more* prejudicial as to those convictions.

Whether or not the evidence pertaining to race was prejudicial depends on whether the jury considered it in convicting on the grand theft and diversion counts. (See Evid. § 1101, subd. (a).) Of course, we will never know, and therein lies the problem.

**<u>Section 386 Requires More Than "Ordinary Negligence"</u>**

Finally, I want to emphasize the importance of the court's holding today that section 386 "does not impose strict liability for poor workmanship, nor does it proscribe acts of negligence or incompetence." (Maj. opn. at p. 22.)

2

Section 386 does not convert all contractual disputes with fire protection system contractors into criminal affairs. Nor does it permit prosecution over a contractor's substandard work which does not rise to the level of *criminal* negligence.

## Conclusion

The number of charges from the grand jury indictment that the prosecution took to trial is concerning. Of course, the magnitude of counts in many criminal cases is a justifiable and important aspect of adequately fulfilling prosecutorial duties in furtherance of justice and the public's interest. However, under the unique facts and nature of this case related to workmanship and competency of performance of a construction contract, the quantity and nature of charged counts raises questions about the justness of the result. Yet, the deference that must be given to prosecutorial discretion makes it extremely difficult to fashion a workable rule that guides or limits the government's charging decisions. Any *per se* rule prohibiting this conduct would likely be "inflexible and arbitrary." (*U.S. v. Smith*, *supra*, 1993 WL 346875.)

Thus, while I believe it would be just for defendant to receive a new trial on the remaining felony charges, the law does not currently provide for one under these circumstances. For that reason, I concur.

_____
Poochigian, J.

3