Filed 12/16/13  P. v. Gant CA2/7

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| THE PEOPLE, | B243662 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. BA386300) |
| v. | |
| CLARENCE LATEASE GANT, | |
| Defendant and Appellant. | |

_____

APPEAL from a judgment of the Superior Court of Los Angeles County, Drew E. Edwards, Judge.  Affirmed in part and reversed in part with directions.

Sally Patrone Brajevich, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Senior Assistant Attorney General, Linda C. Johnson and Ryan M. Smith, Deputy Attorneys General, for Plaintiff and Respondent.

_____

# INTRODUCTION

Defendant Clarence Latease Gant appeals from a judgment of conviction entered after a jury found him guilty of battery on a person causing serious bodily injury (Pen. Code, §§ 242, 243, subd. (d);[1] count 1), threatening a witness (§ 140, subd. (a); count 2), and assault by means likely to produce great bodily injury (former § 245, subd. (a)(1), now § 245, subd. (a)(4); count 3).[2]  The jury found true the allegations that Gant caused great bodily injury in the commission of the battery and the assault (§ 12022.7, subd. (a)). Gant admitted a prior serious felony conviction (§§ 667, subds. (a)(1), (b)-(i), 1170.12). The trial court sentenced Gant on count 1 to state prison for a term of 16 years, consisting of the upper term of four years doubled as a second strike under the "Three Strikes" law, plus three years for the great bodily injury enhancement pursuant to section 12022.7, subdivision (a), plus five years for the prior serious felony conviction pursuant to section 667, subdivision (a)(1).  The court imposed a sentence of eight years on counts 2 and 3 (four years doubled), and imposed five-year enhancements for the prior serious felony conviction on these two counts.  The trial court stayed the sentences on counts 2 and 3 pursuant to section 654.

On appeal Gant argues that the trial court committed evidentiary, instructional, and sentencing errors.  He also contends that his conviction for threatening a witness must be reversed because there was no pending criminal proceeding at the time he threatened the witness.  We agree with Gant that there are several errors in his sentence. We therefore affirm the convictions, strike several enhancements, and remand the matter for resentencing.

---

[1]     Unless otherwise stated, all section references are to the Penal Code.

[2]     "Effective January 1, 2012 former subdivision (a)(1) of section 245 was divided into two separate and distinct subdivisions: section 245, subdivision (a)(1), now prohibits assault with a deadly weapon or instrument other than a firearm, and new subdivision (a)(4) prohibits assault by means of force likely to produce great bodily injury.  (Stats. 2011, ch. 183, § 1.)" (*People v. Brown* (2012) 210 Cal.App.4th 1, 5, fn. 1)

A.     *The Crimes*

Agustin Cortez and his wife, Dulce Maria Nunez, operated a restaurant on West Florence Avenue in Los Angeles.  In June 2011 Gant came into the restaurant and ordered a $6 burrito.  Cortez recognized Gant as someone he had seen in the neighborhood.  After the restaurant served Gant the burrito, Gant left without paying for it.

Two weeks later, Gant came back to the restaurant, ordered a $5 burrito, and put $3 down on the counter.  Cortez told Gant, "This is money you owe me.  The last time that I gave you a burrito, you did not pay for it."  Gant responded, "No.  Give me the burrito."  Cortez told him the burrito cost $5 and Gant still owed him money.  Cortez noticed a police car passing by and flagged it down.  He told the officers that Gant had previously ordered a burrito and had not paid for it.  The officers told Gant he had to pay for it.  Gant took $5 from his pocket and extended it toward Cortez, but then took back the $5 in his hand and the $3 he had put on the counter.  The officers told Gant to walk away, and he left the restaurant.[3]

Three or four days later, Gant and a friend came into the restaurant and headed for the condiment table.  Cortez went there, and Gant told him that he wanted some containers of salsa.  Cortez said he could not give the salsa to him but would sell them to him for $1.  Gant said it was too expensive, threw some containers of salsa in Cortez's face, and ran out of the restaurant.

On July 6, 2011, at about midnight, Cortez went to the liquor store across the street to buy some milk, while Nunez waited for him outside the restaurant.  As Cortez came out of the liquor store, Gant and a young woman were blocking his way.  He tried to pass between them, but Gant grabbed his shoulder and asked him why he called the

---

[3]     Gant was acquitted of defrauding an innkeeper and attempted defrauding an innkeeper.  (Pen. Code, §§ 537, subd. (a)(1), 664; counts 5 and 6.)

police.  Cortez asked, "How is it that you want me to give you the things.  I paid for those things."  Gant began punching Cortez with his fists, and Cortez tried to shield himself from the blows with the jug of milk he had purchased.  Nunez saw what was happening and went inside the restaurant to call the police.  Gant reached into his sweater and pulled out a small metal object.  He struck Cortez in the face with it, cutting him.  Gant then threw the metal object on the ground.[4]  As Cortez, who was bleeding profusely, made his way across the street, Gant stated, "I fucked you over."

The police and paramedics arrived a few minutes later.  Los Angeles Police Officer Brian Friesen spoke to Nunez.  Nunez pointed out Gant, who was still standing near the liquor store with the young woman.  Gant and the young woman began walking away as soon as the officer looked in his direction.  Officer Friesen followed them into an alley and ordered them to put their hands on their heads.  The woman complied.  Gant initially raised his hands but kept lowering them and reaching for his waistband.  Officer Friesen ordered Gant to get on his knees and kicked Gant on the side to get him off balance, so that Gant would use his hands to break his fall and rather than reach for his waistband and possibly arm himself.  Officer Friesen and his partner then took Gant into custody.  Officer Friesen observed that Gant had blood spattered on his hands but did not appear to have any injuries.

Paramedics took Cortez to the hospital, where he received 27 stitches to his face.  At trial, his scars were still visible.

B.    *Gant's Version*

Gant testified that he went to Cortez and Nunez's restaurant only once, and on that occasion Cortez flagged down the police and told them he had stolen a burrito.  Gant told the police that Cortez must have mistaken him for another Black man.  Gant never returned to the restaurant.  Gant's girlfriend, Siera Yuba, had gone to the restaurant

---

**4**    Nunez saw someone pick up the object and take it away.

4

previously and bought food while he went to the liquor store across the street to buy cigarettes.

On July 6, 2011 Gant went into the liquor store across from the restaurant while Yuba waited for him outside. When Gant came out of the liquor store, he saw Cortez harassing Yuba and trying to grab her crotch or buttocks. Gant stepped between them. Cortez, who appeared drunk, made a racial slur and hit Gant in the face with his fist. Gant hit Cortez, who started swinging at Gant, hitting him in the face multiple times. Finally, Cortez kicked Gant in the crotch and ran across the street. Gant did not use a weapon, and Cortez was not bleeding when he left. Once Cortez got to the restaurant, he crouched down, removed his shirt, wiped his face, and started bleeding.

After the police arrived Gant wanted to talk to them, but Yuba wanted to go home. As they started to walk away, the police came and told them to stop and put their hands up. Gant still had his change from the liquor store in his hand and attempted to put it in his pocket. The officers told him to put his hands up and get on his knees. He put his hands on his head and one of the officers kicked him and pushed him to the ground. After he was on the ground, the officer kicked him again and said, "Didn't I tell you put your hands on your head?" Gant said, "I did. I am cooperating." The officer handcuffed him and stated, "It was a mutual combat, but you took it too far." Gant acknowledged that he had a prior conviction for assault with a deadly weapon.

C.     *Officer Friesen's Rebuttal Testimony*

Officer Friesen interviewed Gant at the police station. Gant told him that when he came out of the liquor store, someone yelled a racial epithet and then punched him in the face. Gant said he did not know who punched him. Gant never said that he was kicked in the crotch.

Officer Friesen denied telling Gant it was mutual combat but that Gant had taken it too far. Friesen testified that he only kicked Gant once before taking him into custody. A police sergeant conducted a use of force investigation at the scene, and Gant was photographed approximately one hour after the incident to document any injuries. Gant

did not have any injuries on his face or that were consistent with having been punched multiple times.

## DISCUSSION

A.    *Exclusion of Evidence of Cortez's Prior Misconduct*

Cortez had two prior misdemeanor convictions: one for indecent exposure in 1996 (§ 314, subd. 1) and one for battery against a custodial officer in 1997 (§ 243.1).[5] Counsel for Gant argued to the trial court, "[w]ith respect to the [indecent exposure conviction], realizing it is a misdemeanor and a few years ago and remoteness is an issue, I think the current situation that exists, to the best of my knowledge, is that this witness, number one, should be advised by the court if he is going to testify that he is opening up the door to being arrested and charged," referring to counsel's assertion that Cortez had failed to register as a sex offender pursuant to section 290. Counsel for Gant stated that Cortez "changed his name from David Jimenez to what it is now. That shows to me consciousness of guilt. It also shows a need on his part to deceive. That is an ongoing thing, and it didn't stop in 1996. It goes right to today. I think that is a moral turpitude issue that the jury should be very well aware of."

The prosecutor argued that the prior convictions were inadmissible because they were "far too remote." She did not "believe there is a deliberateness to change the name" or an issue with failing to register as a sex offender, and "that goes far beyond what we are doing here, simply does this individual have a crime of moral turpitude . . . ."

Counsel for Gant responded that the indecent exposure conviction involved several instances of masturbating in front of a woman at her home. As to the name change, counsel noted that Cortez did not have a driver's license and was self-employed, which "tells me he is avoiding problems with immigration." Counsel repeated that the

---

[5]    The trial in this case occurred in 2012.

name change "is a dual purpose, and that is to avoid a registration situation. He has the obligation. He is continuing to commit a felony every day he wakes up. I think that is an issue that the jury should know."

The trial court noted that the misdemeanor conduct occurred in 1996 and 1997, 15 years or more earlier. Under Evidence Code section 352, the court ruled that the prior convictions were "too remote in time and more prejudicial than [they] would be probative."

Evidence of a witness' misconduct that involves moral turpitude and results in a misdemeanor conviction is admissible for impeachment purposes. (*People v. Wheeler* (1992) 4 Cal.4th 284, 295, 297; *People v. Lopez* (2005) 129 Cal.App.4th 1508, 1522; see *People v. Pearson* (2013) 56 Cal.4th 393, 434 ["evidence of nonfelonious conduct reflecting moral turpitude may be admitted for purposes of impeachment"].) Such misconduct may suggest a willingness to lie and thus is relevant to the witness' credibility. (*Wheeler*, *supra*, at pp. 295-296.) Indecent exposure is a crime involving moral turpitude and thus admissible for impeachment purposes. (*People v. Ballard* (1993) 13 Cal.App.4th 687, 695-696.) Battery against a custodial officer is not. (*Lopez*, *supra*, at pp. 1522-1523.)

Even if such evidence is admissible as involving moral turpitude, the trial court has broad discretion under Evidence Code section 352 to exclude it where the probative value of the evidence is substantially outweighed by its potential for undue prejudice, confusion, or consumption of time. (*People v. Clark* (2011) 52 Cal.4th 856, 931; *People v. Wheeler*, *supra*, 4 Cal.4th at p. 295.) In general, misconduct resulting in a misdemeanor conviction is less probative of dishonesty than felony convictions. (*Clark*, *supra*, at p. 932; *Wheeler*, *supra*, at p. 296.) In addition, impeachment by evidence of such misconduct involves problems of proof not presented by felony convictions. The impeaching party must introduce evidence of the misconduct and not merely evidence of the resulting misdemeanor conviction. (*Wheeler*, *supra*, at pp. 296-297.) Therefore, the trial court should exercise particular care in determining whether the admission of such evidence might involve undue prejudice, confusion, or consumption of time that

7

substantially outweighs its probative value. (*Ibid.*) We review the trial court's ruling under Evidence Code section 352 for abuse of discretion. (*People v. Lightsey* (2012) 54 Cal.4th 668, 714.)

One of the factors the trial court should consider in determining whether to admit evidence of prior misconduct for purposes of impeachment is the nearness or remoteness in time of the prior misconduct. (*People v. Edwards* (2013) 57 Cal.4th 658, 722; *People v. Clark*, *supra*, 52 Cal.4th at p. 931.) Convictions over 10 years old are presumptively too remote to admit for impeachment purposes. (*People v. Pitts* (1990) 223 Cal.App.3d 1547, 1554.) Where a conviction remote in time is followed by additional convictions during the intervening years, however, the conviction may be admissible to show a pattern of criminal behavior that is relevant to credibility. (*People v. Green* (1995) 34 Cal.App.4th 165, 183; see *People v. Mendoza* (2000) 78 Cal.App.4th 918, 925-926 ["[e]ven a fairly remote prior conviction is admissible if the defendant has not led a legally blameless life since the time of the remote prior"].)

Cortez's 15-year-old indecent exposure conviction was sufficiently remote that the trial court did not abuse its discretion in excluding it. (See *People v. Feaster* (2002) 102 Cal.App.4th 1084, 1093-1094 [no abuse of discretion in excluding 12-year-old conviction]; *People v. Pitts*, *supra*, 223 Cal.App.3d at p. 1554.) Gant argues that because Cortez was convicted for indecent exposure and then continued to fail to register as a sex offender, the trial court should have admitted Cortez's conviction for indecent exposure, along with the failure to register, for impeachment. Gant, however, did not offer any evidence that Cortez was ever convicted of failing to register as a sex offender. In the absence of a conviction, the trial court did not abuse its discretion in excluding evidence of Cortez's failure to register as a sex offender. Evidence Code section 352 gives courts broad latitude to exclude evidence in order "to prevent criminal trials from degenerating into nitpicking wars of attrition over collateral credibility issues." (*People v. Wheeler*, *supra*, 4 Cal.4th at p. 296; accord, *People v. Lightsey*, *supra*, 54 Cal.4th at p. 714.)

8

B.    *Failure To Instruct on Self-Defense*

The trial court has the duty to instruct the jury on defenses, including self-defense, "'if it appears the defendant is relying on such a defense, or if there is substantial evidence supportive of such a defense and the defense is not inconsistent with the defendant's theory of the case.'" (*People v. Boyer* (2006) 38 Cal.4th 412, 469; see *People v. Villanueva* (2008) 169 Cal.App.4th 41, 49 [self-defense].) "'In determining whether the evidence is sufficient to warrant a jury instruction, the trial court does not determine the credibility of the defense evidence, but only whether "there was evidence which, if believed by the jury, was sufficient to raise a reasonable doubt . . . ." [Citations.]' [Citation.]" (*People v. Larsen* (2012) 205 Cal.App.4th 810, 823-824, quoting *People v. Salas* (2006) 37 Cal.4th 967, 982-983.) The court must resolve any doubts regarding the sufficiency of the evidence in favor of the defendant. (*Larsen*, *supra*, at p. 824.)

At trial, Gant did not rely on the defense of self-defense, nor did he ask for an instruction on self-defense. Thus, the only issue is whether the trial court had a duty to instruct the jury sua sponte on self-defense because there was substantial evidence to support such a defense.

Self-defense requires that the defendant have an honest and reasonable belief that he was in imminent danger of suffering bodily injury, the use of force was necessary to defend against such danger, and he used no more force than was necessary to defend himself. (*People v. Valenzuela* (2011) 199 Cal.App.4th 1214, 1227; *People v. Villanueva*, *supra*, 169 Cal.App.4th at pp. 49-50.) Gant never testified that he feared bodily injury or that he believed the use of force was necessary to defend against any such injury. Instead, he testified that Cortez took a swing at him and backed away, and then Gant pursued Cortez down the stairs to sidewalk and began fighting with him. This is not substantial evidence of self-defense. (See *People v. Minifie* (1996) 13 Cal.4th 1055, 1064-1965 [for self-defense, "threat of bodily injury must be imminent" and "'any right of self-defense is limited to the use of such force as is reasonable under the circumstances'"]; *People v. Gleghorn* (1987) 193 Cal.App.3d 196, 202 ["[i]f a person

9

attacked defends himself so successfully that his attacker is rendered incapable of inflicting injury, or for any other reason the danger no longer exists, there is no justification for further retaliation"]; *People v. Perez* (1970) 12 Cal.App.3d 232, 236 ["the right of self-defense is based upon the appearance of imminent peril to the person attacked," and "[w]hen that danger has passed and the attacker has withdrawn, there can be no justification for the use of further force"].)  The trial court did not err in failing to give the jury an instruction on self-defense.

  C. *Threatening a Witness*

  Section 140, subdivision (a), makes it a crime to "willfully use[] force or threaten[] to use force or violence upon the person of a witness to, or a victim of, a crime or any other person . . . because the witness, victim, or other person has provided any assistance or information to a law enforcement officer, or to a public prosecutor in a criminal proceeding or juvenile court proceeding . . . ."  Gant contends that his conviction of threatening a witness must be reversed because there was no pending criminal proceeding when he attacked Cortez.  Gant argues that "there was insufficient evidence to prove a violation of section 140, subdivision (a) because . . . there was no criminal case pending against" Gant and "[t]here was also no evidence [Gant] knew about a pending criminal case."

  Gant's argument fails because it is based on a flawed interpretation of section 140, subdivision (a).  Gant's argument assumes that the phrase "in a criminal proceeding" applies to providing assistance or information to both a public prosecutor and a law enforcement officer.  We conclude, however, that "in a criminal proceeding" modifies "a public prosecutor," not "a law enforcement officer."

  1. Rules Governing Interpretation of Statutes

  "'We begin with the fundamental rule that our primary task is to determine the lawmakers' intent.' [Citation.]  'In construing statutes, we aim "to ascertain the intent of the enacting legislative body so that we may adopt the construction that best effectuates

10

the purpose of the law."' [Citation.] California courts 'have established a process of statutory interpretation to determine legislative intent that may involve up to three steps.' [Citation.] The 'key to statutory interpretation is applying the rules of statutory construction in their proper sequence . . . as follows: "we first look to the plain meaning of the statutory language, then to its legislative history and finally to the reasonableness of a proposed construction."' [Citation.]" (*Mt. Hawley Ins. Co. v. Lopez* (2013) 215 Cal.App.4th 1385, 1396-1397; see *Day v. City of Fontana* (2001) 25 Cal.4th 268, 272.)

In applying the rules of statutory construction, we start "by examining the statutory language, giving the words their usual and ordinary meaning. [Citation.] If there is no ambiguity, then we presume the lawmakers meant what they said, and the plain meaning of the language governs. [Citations.] If, however, the statutory terms are ambiguous, then we may resort to extrinsic sources, including the ostensible objects to be achieved and the legislative history. [Citation.] In such circumstances, we '"select the construction that comports most closely with the apparent intent of the Legislature, with a view to promoting rather than defeating the general purpose of the statute, and avoid an interpretation that would lead to absurd consequences." [Citation.]' [Citations.]" (*Day v. City of Fontana*, *supra*, 25 Cal.4th at p. 272.) "'"If ambiguity remains after resort to secondary rules of construction and to the statute's legislative history, then we must cautiously take the third and final step in the interpretive process. [Citation.] In this phase of the process, we apply 'reason, practicality, and common sense to the language at hand.' [Citation.] Where an uncertainty exists, we must consider the consequences that will flow from a particular interpretation. [Citation.] Thus, '[i]n determining what the Legislature intended we are bound to consider not only the words used, but also other matters, "such as context, the object in view, the evils to be remedied, the history of the times and of legislation upon the same subject, public policy and contemporaneous construction." [Citations.]' [Citation.] These 'other matters' can serve as important guides, because our search for the statute's meaning is not merely an abstract exercise in semantics. To the contrary, courts seek to ascertain the intent of the Legislature for a reason—'to *effectuate the purpose* of the law.'"' [Citations.]" (*Mt. Hawley Ins. Co. v.*

11

*Lopez, supra*, 215 Cal.App.4th at p. 1397; see *Joannou v. City of Rancho Palos Verdes* (2013) 219 Cal.App.4th 746, 752, fn. omitted [if the statute is ambiguous, "we resort to secondary rules of construction," which "include maxims of construction, which express familiar insights about conventional language usage, the legislative history, and the wider historical circumstances of a statute's enactment"].)

### 2. The Language of the Statute

Gant does not argue that section 140, subdivision (a), is ambiguous, and we do not think it is. The statute says that "every person who willfully uses force or threatens to use force or violence upon the person of a witness to, or a victim of, a crime or any other person . . . because the witness, victim, or other person has provided any assistance or information to a law enforcement officer, or to a public prosecutor in a criminal proceeding or juvenile court proceeding, shall be punished by imprisonment . . . ." The plain meaning of this sentence is that a person violates this statute by threatening a witness, victim, or other person because the witness, victim, or other person (1) provided assistance or information to a law enforcement officer, or (2) provided assistance or information to a public prosecutor in connection with a proceeding. The only reasonable interpretation of this statute is that "in a criminal proceeding" modifies "a public prosecutor," not "a law enforcement officer." Nevertheless, to the extent there is any ambiguity, we proceed to the second step because it "lend[s] strong support to our conclusion . . . ." (*Brown v. Valverde* (2010) 183 Cal.App.4th 1531, 1552.)

### 3. Maxims of Construction

The last antecedent rule "generally provides that '"qualifying words, phrases and clauses are to be applied to the words or phrases immediately preceding and are not to be construed as extending to or including others more remote."' [Citation.] However, '[e]vidence that a qualifying phrase is supposed to apply to all antecedents instead of only to the immediately preceding one may be found in the fact that it is separated from the antecedents by a comma.' [Citation.]" (*Orthopedic Systems, Inc. v. Schlein* (2011) 202

12

Cal.App.4th 529, 545; accord, *People v. Lewis* (2008) 43 Cal.4th 415, 492-493; see *County of Kern v. Workers' Comp. Appeals Bd.* (2011) 200 Cal.App.4th 509, 521.)**6** In addition, "'"when several words are followed by a clause that applies as much to the first and other words as to the last, ""'"the natural construction of the language demands that the clause be read as applicable to all."'"" [Citation]'" (*Mt. Hawley Ins. Co. v. Lopez*, *supra*, 215 Cal.App.4th at p. 1413.) And "'"when the sense of the entire act requires that a qualifying word or phrase apply to several preceding words, its application will not be restricted to the last.'" (*Ibid.*)

Section 140, subdivision (a), does not have an offsetting comma between "public prosecutor" and "in a criminal proceeding or juvenile court proceeding." Thus, under the last antecedent rule, "in a criminal proceeding or juvenile court proceeding" modifies only its last antecedent, a public prosecutor, not the more remote antecedent, a law enforcement officer. In addition, the phrase "in a criminal proceeding or juvenile court proceeding" naturally applies more to public prosecutors, whose entire professional responsibility involves court proceedings, than to law enforcement officers, whose involvement in court proceedings is only a small part of their public safety responsibilities.

---

**6** *County of Kern v. Workers' Comp. Appeals Bd.*, *supra*, 200 Cal.App.4th 509 involved Labor Code section 3361, which provides: "Each member registered as an active firefighting member of any regularly organized volunteer fire department, having official recognition, and full or partial support of the government of the county, city, town, or district in which the volunteer fire department is located, is an employee of that county, city, town, or district for the purposes of this division, and is entitled to receive compensation from the county, city, town or district in accordance with the provisions thereof." The issue in *County of Kern* was whether the modifier "of the government of the county" applied to both having "official recognition" and "full or partial support." (*County of Kern*, *supra*, at p. 521.) The court concluded that "the phrase only modifies the last antecedent to which the phrase is a part. . . . Lacking a comma offsetting it from 'full or partial support,' the local government qualifying phrase can only reasonably be deemed to modify 'support.'" (*Ibid.*)

Moreover, where "a phrase 'is set off from the rest of the main sentence by commas,' it 'should be read as a parenthetical [phrase]' because such a grammatical structure 'indicates an intent to segregate th[e] [phrase] from the rest of the sentence.' [Citation.]" (*Dow v. Lassen Irrigation Co.* (2013) 216 Cal.App.4th 766, 783.) Punctuation such as commas is "normally used to divide and isolate ideas." (*In re S.C.* (2009) 179 Cal.App.4th 1436, 1441; accord, *People v. Franklin* (2003) 105 Cal.App.4th 532, 539.) Here, the phrase "to a public prosecutor in a criminal proceeding or juvenile court proceeding" is preceded by a comma, and the word "or" "indicates an intention to use it disjunctively so as to designate alternative or separate categories." (*White v. County of Sacramento* (1982) 31 Cal.3d 676, 680.) The comma setting off "or to a public prosecutor in a criminal proceeding or juvenile court proceeding" further isolates "in a criminal proceeding or juvenile court proceeding" from "a law enforcement officer."

### 4. Legislative History

The legislative history of the predecessor to section 140, former section 152 (Stats. 1982, ch. 1100, § 1, renumbered section 140 and amended by Stats. 1985, ch. 962, § 4), confirms that the phrase "in a criminal proceeding" applies only to "a public prosecutor." (See *Elk Hills Power, LLC v. Board of Equalization* (2013) 57 Cal.4th 593, 610 [court may consider statute's legislative history in construing statute]; *People v. Williams* (2013) 218 Cal.App.4th 1038, 1048 ["'[r]eviewing courts may turn to the legislative history behind even unambiguous statutes when it confirms or bolsters their interpretation'"].) Nothing in the legislative history of former section 152 indicates an intent to limit the statute's application to witness intimidation occurring after the initiation of a criminal proceeding.

The subject of Assembly Bill 2691, which enacted former section 152, was "Threats on Witnesses in Retaliation for Testimony or Cooperating with Law Enforcement: Felony Penalties; Mandatory No Probation for Witness Intimidation with Firearms." The digest prepared for the Assembly Committee on Criminal Justice notes: "Under current law, use of threats and force to prevent a witness from testifying or giving

14

information to peace officers is punishable as a felony. . . . [¶] This bill would make it a felony punishable by 2, 3 or 4 years to threaten to use force or violence . . . because the person threatened provided assistance to law enforcement or prosecuting authorities." (Assem. Com. on Criminal Justice, Analysis of Assem. Bill No. 2691 (1981-1982 Reg. Sess.) as introduced, Mar. 22, 1982.) This language supports the conclusion the statute must be read in the disjunctive, applying to a person who threatens a witness who gave information to law enforcement, or a witness who cooperated with prosecuting authorities in a criminal proceeding.

The Judicial Council of California's Review and Analysis of Assembly Bill No. 2691 prepared for the Senate Committee on Judiciary dated March 19, 1982 does not even refer to "a criminal proceeding." It refers to threats "against a person who has assisted law enforcement officials."[7] Similarly, the Enrolled Bill Report by the Finance Department states that the bill "makes it a misdemeanor to threaten by use of force or violence . . . [against] a witness, victim, or other person who aids law enforcement agencies."

Moreover, the background information provided to the Senate Committee on Judiciary notes that the bill was requested by the Chief of the Hard Core Gang Prosecution Unit of the Los Angeles County District Attorney's Office. Gang members do use intimidation to prevent witnesses from testifying against other gang members in criminal proceedings. (See *Alvarado v. Superior Court* (2000) 23 Cal.4th 1121, 1149 & fn. 15 [discussing the problem of witness intimidation by the Mexican Mafia in Los Angeles County and stating, "we are keenly aware of the serious nature and magnitude of

---

[7] The Senate Committee on Judiciary report on Assembly Bill No. 2691 does characterize one of the key issues with the bill as whether it should "be a misdemeanor willfully to threaten to use force against a person . . . because she has assisted law enforcement in a criminal or juvenile court action." Elsewhere, however, the report states that "[t]his bill would make it a misdemeanor willfully to threaten a person . . . because she had assisted law enforcement." (*Id*. at p. 3.) In any event, the focus of the report is the constitutionality of criminalizing speech, not what types of threats are included.

15

the problem of witness intimidation"]; *People v. Duran* (2002) 97 Cal.App.4th 1448, 1455 ["[c]ommunity intimidation serves a gang's interests by causing witnesses to refuse to testify against gang members"].)  But gang members also use intimidation to prevent people from reporting gang activities to law enforcement, so that the gang can continue its criminal activities.  (See, e.g., *People v. Gardeley* (1996) 14 Cal.4th 605, 613 [relying on expert testimony that gang members "act[] in concert to assault a person in full view of residents of an area where the gang sells drugs" in order "to intimidate the residents and to dissuade them from reporting the gang's drug-dealing activities to police"]; *People v. Vazquez* (2009) 178 Cal.App.4th 347, 354 [relying on expert testimony that "violent crimes like murder elevate the status of the gang within gang culture and intimidate neighborhood residents who are, as a result, 'fearful to come forward, assist law enforcement, testify in court, or even report crimes'"].)

In an August 24, 1982 letter to Governor Brown, Assemblyman Art Torres, the bill's sponsor, noted that the Los Angeles County Board of Supervisors "held lengthy hearings on violent crime focusing on the growing problem of gang violence against victims and witnesses.  With the cooperation of the Los Angeles City Council and the Hard-Core Gang Prosecution Unit of the Los Angeles County District Attorneys [*sic*] Office, I introduced the Gang Anti-Terrorism Act (AB 2682-2691) which addresses specific problems presented at the Board hearings.  The entire legislative package has received bipartisan support in both houses and was unanimously approved by both the Assembly Criminal Justice Committee and the Senate Judiciary Committee.  [¶]  AB 2691 would add a new section to the Penal Code (Section 152) making it a misdemeanor to threaten to use force or violence upon a person who assists police or prosecutors . . . ."[8] The Enrolled Bill Report recommending that the governor sign the legislation states:

_____

**8**    While letters from individual legislators to the governor are not generally admissible as legislative history (*People v. Valenzuela* (2001) 92 Cal.App.4th 768, 776), they may be admissible "if they reflect the general legislative understanding or allude to arguments or discussions which actually took place during the legislative process. (*Courtesy Ambulance Service v. Superior Court* (1992) 8 Cal.App.4th 1504, 1512, fn. 6.)

16

"Under existing law it is generally a misdemeanor to prevent, or attempt to prevent, a witness from testifying. . . . [¶] This bill creates a new misdemeanor for threatening a witness with retribution for testifying. Similar to current law, the bill will cover *general threats where a specific intent to prevent testimony cannot be established.*" (Enrolled Bill Rep. on Assem. Bill No. 2691, Governor's Office, Dept. of Legal Affairs, Sept. 13, 1982, italics added; see *In re Lucas* (2012) 53 Cal.4th 839, 855-856 [discussing Enrolled Bill Report to governor as part of legislative history]; *City of Scotts Valley v. County of Santa Cruz* (2011) 201 Cal.App.4th 1, 39-40 [same].)

Thus, the legislative history of Assembly Bill No. 2691, as well as the context in which it became law (*Mt. Hawley Ins. Co. v. Lopez*, *supra*, 215 Cal.App.4th at p. 1397), supports the conclusion that "in a criminal proceeding" applies only to "a public prosecutor" and does not apply to "to a law enforcement officer." Contrary to the assumption underlying Gant's argument, Section 140, subdivision (a), does not require that there is a pending criminal proceeding in order for a defendant to be convicted of "willfully us[ing] force or threaten[ing] to use force or violence upon the person of a witness to, or a victim of, a crime or any other person . . . because the witness, victim, or other person has provided any assistance or information to a law enforcement officer."

5.      Practical Consequences

Although the language and legislative history "suffices to support" our interpretation of section 140, subdivision (a), "applying 'reason, practicality, and common sense to the language at hand' confirms that conclusion." (*Ailanto Properties, Inc. v. City of Half Moon Bay* (2006) 142 Cal.App.4th 572, 591.) There is no practical or public policy reason to limit the application of section 140, subdivision (a), to defendants who use force or threaten to use force against those who provide information and assistance to law enforcement officers in connection with a pending criminal proceeding. Public safety concerns require that witnesses, victims, and others have the opportunity and ability to assist and provide information to law enforcement officers long before, and regardless of whether there ever is, a criminal proceeding. It would also defy common

17

sense to criminalize intimidation of witnesses once criminal proceedings have been initiated but allow intimidation of those witnesses in order to prevent them from reporting crimes to law enforcement in the first place thereby preventing the initiation of criminal proceedings.

### 6.      Conclusion

Gant's argument that there is insufficient evidence to support his conviction of threatening a witness is premised on a flawed interpretation of section 140, subdivision (a).  His conviction under the statute does not require evidence that there was a criminal proceeding pending at the time he attacked Cortez.

### D.      *Enhancement for Prior Serious Felony Conviction*

The trial court imposed a five-year enhancement on count 1 for a prior serious felony conviction under section 667, subdivision (a)(1).  The trial court imposed and stayed the same enhancement on counts 2 and 3.  Gant argues that this was error because the trial court could impose the enhancement only once.  The People state that "[i]t appears [Gant's] contention has merit," and that "the five-year priors imposed but stayed in counts 2 and 3 should be stricken."  We agree that the trial court erred by imposing the five-year enhancements on all three counts.

Section 667, subdivision (a)(1), provides that "any person convicted of a serious felony who previously has been convicted of a serious felony . . . shall receive, in addition to the sentence imposed by the court for the present offense, a five-year enhancement for each such prior conviction on charges brought and tried separately." Section 1192.7, subdivision (c), lists those felonies that qualify as serious.  (See *People v. Garcia* (2008) 167 Cal.App.4th 1550, 1563 ["section 667, subdivision (a)(1) five-year prior conviction enhancement only applies when the current offense is a serious felony listed in section 1192.7, subdivision (c)"].)  Section 140, count 2 in this case, is not listed

in section 1192.7, subdivision (c).[9]  Therefore, the trial court erred by imposing the five-year enhancement on count 2.

Count 1, battery causing serious bodily injury, is a serious felony.  So is count 3, assault by means likely to produce great bodily injury, when, as here, it is enhanced with the element of personal infliction of great bodily injury.  (See § 1192.7, subd. (c)(8); *People v. Feyrer* (2010) 48 Cal.4th 426, 442, fn. 8 ["the offense of assault by means of force likely to produce great bodily injury constitutes a serious felony"]; *People v. Winters* (2001) 93 Cal.App.4th 273, 276 [assault in which the defendant personally inflicts great bodily injury is a serious felony under section 1192.7, subdivision (c)(8)]; *People v. Moore* (1992) 10 Cal.App.4th 1868, 1870 ["a felony battery committed by means of 'serious bodily injury' (Pen. Code, § 243, subd. (d)) may be used to enhance a sentence under the 'serious felony' provisions of Penal Code section[] 667, subdivision (a), because the term 'serious bodily injury' is essentially equivalent to and synonymous with the term 'great bodily injury,' as required by Penal Code section 1192.7, subdivision (c)(8)"]; accord, *People v. Wade* (2012) 204 Cal.App.4th 1142, 1149.)  The trial court, however, erred by imposing the five-year enhancement on both count 1 and count 3.

The Supreme Court in *People v. Tassell* (1984) 36 Cal.3d 77, 89-92, overruled on another ground in *People v. Ewoldt* (1994) 7 Cal.4th 380, 401, held that "when imposing a determinate sentence on a recidivist offender convicted of multiple offenses, a trial court is to impose an enhancement for a prior conviction only once to increase the aggregate term, and not separately to increase the . . . term imposed for each new offense." (*People v. Williams* (2004) 34 Cal.4th 397, 400, fn. & italics omitted.)  In *Williams*, the Supreme Court concluded that *Tassell*, which involved determinate sentences imposed under section 1170.1, did not apply to indeterminate terms imposed under the Three Strikes law.  (*Id*. at pp. 400, 402.)  Rather, "under the Three Strikes law,

---

[9]  Preventing or dissuading a witness in violation of section 136.1 is a serious felony. (See § 1192.7, subd. (c)(37).)

section 667[, subdivision ](a)[(1)] enhancements are to be applied individually to each count of a third strike sentence." (*Id.* at p. 405; see *People v. Thomas* (2013) 214 Cal.App.4th 636, 640 ["[i]f this were a case where both counts were determinate terms, then only one set of [Health and Safety Code] section 11370.2, subdivision (a) prior conviction enhancements could be imposed"].)

In *People v. Misa* (2006) 140 Cal.App.4th 837, the trial court sentenced the defendant, a second strike offender, to an indeterminate sentence for torture pursuant to section 206.1, as well as a determinate second strike term for assault. (*Misa*, *supra*, at pp. 846-847.) The issue was whether the trial court could impose a prior serious felony enhancement under section 667, subdivision (a)(1), on both counts. Applying the analysis in *Williams*, the court in *Misa* concluded that "[a]lthough [the defendant] was a second strike defendant rather than a third striker, he is nonetheless a recidivist and, pursuant to the [*Williams*] analysis of the [Three Strikes] statutory scheme, is thus subject to a prior conviction enhancement under section 667, subdivision (a)[(1)] on the torture count even though he also received a similar enhancement relating to the assault count." (*Misa*, *supra*, at p. 847.)

The defendant in *Tassell* received two determinate sentences. (*People v. Tassell*, *supra*, 36 Cal.3d at p. 80.) The defendant in *Williams* received multiple indeterminate third strike sentences under the Three Strikes law. (*People v. Williams*, *supra*, 34 Cal.4th at p. 400.) The defendant in *Misa* received an indeterminate sentence on one count and a determinate sentence on another count. (*People v. Misa*, *supra*, 140 Cal.App.4th at p. 846.) Although the court in *Misa* extended *Williams* to a defendant who receives one indeterminate sentence and one determinate sentence, *Williams* and *Misa* do not apply here because Gant received a determinate sentence on each count. (See *People v. Garcia*, *supra*, 167 Cal.App.4th at p. 1560 ["*Williams* and *Misa* hold that in cases where multiple *indeterminate* terms are imposed, all section 667, subdivision (a) five-year serious felony enhancements must be imposed on every count" (italics added)].) Therefore, under *Tassell*, the trial court erred by imposing the five-year enhancement pursuant to section 667, subdivision (a), more than once.

20

E.      *Great Bodily Injury Enhancement*

Gant contends that the trial court erred in imposing an enhancement for causing great bodily injury under section 12022.7, subdivision (a), on count 1, battery on a person causing serious bodily injury (§§ 242, 243, subd. (d)), because great bodily injury is an element of the offense.  The People concede that Gant is correct.

An enhancement may not be based on an element of the offense.  (See *People v. Baird* (1995) 12 Cal.4th 126, 130; *People v. Blackburn* (1999) 72 Cal.App.4th 1520, 1526-1527.)  Thus, a great bodily injury enhancement may not be imposed where great bodily injury is an element of the offense.  (§ 12022.7, subd. (g); *People v. Weaver* (2007) 149 Cal.App.4th 1301, 1326.)  Because "serious bodily injury" under section 243, subdivision (d), and "great bodily injury" under section 12022.7, subdivision (a), "have substantially the same meaning," the great bodily injury enhancement cannot be imposed on a conviction of battery causing serious bodily injury under section 243, subdivision (d).  (*People v. Hawkins* (1993) 15 Cal.App.4th 1373, 1375; see *People v. Wade*, *supra*, 204 Cal.App.4th at p. 1149 ["'serious bodily injury' as used in section 243, is '"essentially equivalent"' to '"great bodily injury,"' as used, for example, in the section 12022.7 enhancement for the infliction of such injury on a person during the commission of a felony"].)  Therefore, the trial court erred by imposing the great bodily injury enhancement on count 1.

The jury, however, also found true the great bodily injury enhancement as to count 3, assault by means likely to produce great bodily injury.  Conviction of assault by means likely to produce great bodily injury under section 245, subdivision (a), "does not require the showing of any actual injury."  (*People v. Parrish* (1985) 170 Cal.App.3d 336, 344.)  Thus, an enhancement under section 12022.7 may be imposed on a conviction of assault by means likely to produce great bodily injury.  (*Parrish*, *supra*, at p. 344; see, e.g., *People v. Cravens* (2012) 53 Cal.4th 500, 502; *People v. Weaver* (2007) 149 Cal.App.4th 1301, 1334-1335.)  Therefore, we will remand the case for resentencing.  (See *People v. Woods* (2010) 191 Cal.App.4th 269, 273 ["[w]hen an unlawful sentencing

21

decision is made . . . , the proper course of action is to allow the trial court to lawfully exercise its discretion and impose a lawful sentence"].)

## DISPOSITION

The true finding as to the great bodily injury enhancement under section 12022.7, subdivision (a), on count 1 is reversed. In all other respects, the judgment of conviction is affirmed. The matter is remanded for resentencing with directions to impose only one five-year enhancement under section 667, subdivision (a)(1), on either count 1 or count 3, whichever serves as the base term.

SEGAL, J.[*]

We concur:

WOODS, Acting P. J.

ZELON, J.

---

[*]    Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.